1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DAVID LAHOTI,

                Plaintiff,

     v.

VERICHECK, INC.,

              Defendant.

CASE NO. C06-1132JLR

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

     This matter came for a bench trial that began on November 6, 2007. Plaintiff/Counterclaim Defendant David Lahoti was represented by John Du Wors and Derek Linke of Newman & Newman, Attorneys at Law, LLP. Defendant Vericheck, Inc. ("Vericheck") was represented by Shannon Jost of Stokes Lawrence, P.S. At the conclusion of the case, the court took the case under advisement. The court has considered the evidence and exhibits admitted at trial, the findings and conclusions reached in the court's order on summary judgment ("SJ Order") (Dkt. # 52), and counsels' arguments. Being fully advised, the court makes its Findings of Fact and Conclusions of Law.

ORDER – 1

# I.  FINDINGS OF FACT

## Background

1.      Vericheck, a Georgia corporation, is a national provider of electronic payment transaction processing services, and has been using the VERICHECK mark (or, "the mark") in connection with its business since at least 1992.  In 2003, Vericheck attempted to register the mark with the United States Patent and Trademark Office ("PTO") but was unable to do so because an Arizona company successfully registered VERICHECK as a word mark in 1975.  Sec. Hannah Decl. at ¶ 8 (Dkt. # 26); Exs. 7, 8.

2.      According to Vericheck's Chief Executive Officer ("CEO") Jerry Hannah, who purchased the company in 1995, Vericheck has maintained a world wide web presence at <vericheck.net> since 1999 and began offering its services online about a year later.  Sec. Hannah Decl. at ¶ 2.  The company also registered the domain names <vericheck.org>, <vericheck.cc>, <vericheck.us>, and <vericheck.biz>, many of which redirect visitors to <vericheck.net>.  Vericheck now conducts its business primarily over the Internet and through its resellers and independent sales offices ("ISOs"), who rely on the Internet, including Vericheck's websites, as a primary mode of communication with Vericheck. On August 31, 2001, the company successfully registered a service mark with the State of Georgia, described as "a depiction of a check mark over the word 'vericheck.'"  Sec. Jost Decl. ¶ 3, Ex. B (Dkt. # 28).

3.      Mr. Lahoti is an adjudicated cybersquatter who has registered thousands of domain names and prospectively registers domain names of services he "might offer" based on his "ideas for new ventures."  Lahoti Decl. at ¶¶ 7-8 (Dkt. # 31); Jost Decl., Ex. B (Dkt. # 16) (*E-Stamp Corp. v. Lahoti*, Case No. 2:99-CV-9287-GAF-MAN (C.D. Cal. Jun. 12, 2000)); Supp. Jost Decl., Ex. K (Dkt. # 23); SJ Order at 12 n.9.  After having

tracked <vericheck.com> (or, "Domain Name") for five years, Mr. Lahoti, a self-described "Internet entrepreneur," registered the Domain Name in March 2003. Lahoti Decl. at ¶¶ 3, 11. The Domain Name incorporates the VERICHECK mark. Mr. Lahoti uses <vericheck.com> in connection with a directory website providing links to companies that compete with Vericheck. *See* Ex. A-10.

4.     Prior to Mr. Lahoti purchasing the Domain Name, it was owned by a Canadian company. For several years, Mr. Hannah and other Vericheck representatives attempted to secure rights to <vericheck.com> from the Canadian company. Once Mr. Lahoti purchased the Domain Name, he expressed a willingness to sell the Domain Name to Vericheck at prices that ranged from $48,000 to $100,000. SJ Order at 3-4.

5.     In June 2006, Vericheck filed a complaint with the National Arbitration Forum ("NAF") pursuant to the Uniform Domain-Name Dispute-Resolution Policy seeking an order transferring <vericheck.com> to Vericheck. Mr. Lahoti responded and objected. In August 2006, the arbitrator issued a decision ordering transfer of the Domain Name to Vericheck.

6.     Mr. Lahoti filed the instant action for declaratory relief challenging NAF's decision pursuant to 15 U.S.C. § 1114(2)(D)(v), which allows a registrant whose domain name has been suspended, disabled, or transferred, to file a civil action to establish that his use of the domain name is lawful. He seeks a declaratory judgment that his use of the Domain Name does not contravene the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), or any other provision of the Lanham Act, 15 U.S.C. § 1051 *et seq.* In its answer, Vericheck pleads the following counterclaims: violation of the ACPA; Lanham Act false designation of origin, 15 U.S.C. § 1125(a); common law trademark infringement and trade name infringement; common law unfair competition

ORDER – 3

and misappropriation; and a violation of Washington's Consumer Protection Act ("CPA"), RCW § 19.86.020.  Vericheck seeks transfer of the Domain Name, statutory damages, and attorneys' fees.

7.     The parties filed cross-motions for summary judgment.  On August 30, 2007, the court denied Mr. Lahoti's motion and granted in part and denied in part Vericheck's motion.  The court found the following: Mr. Lahoti registered and used <vericheck.com> in bad faith, SJ Order at 12-14; Mr. Lahoti is not entitled to take refuge in the "safe harbor" provision of Lanham Act § 43(d), 15 U.S.C. § 1125(d)(1)(B)(ii), SJ Order at 14; the Domain Name and the VERICHECK mark are identical or confusingly similar, *id.* at 6, 17; Vericheck's use of the mark predates Mr. Lahoti's registration of the Domain Name, *id.* at 7 n.5; Mr. Lahoti's use of the Domain Name for a directory website and his offers to sell the Domain Name constitute "commercial use," *id.* at 15; and both parties use the Internet as a marketing channel, *id.* at 17.

8.     With respect to liability, the court found that there were issues of fact with regards to: (1) the distinctiveness of the VERICHECK mark; and (2) the likelihood of consumer confusion caused by Mr. Lahoti's use of the mark.  The first issue affects all five of Vericheck's counterclaims.  The second issue affects all claims except for the ACPA counterclaim.

9.     At the bench trial, Vericheck called two witnesses to testify: Vericheck CEO Mr. Hannah and Mr. Lahoti.  Mr. Lahoti called a single witness, Tom Nort, to testify telephonically in rebuttal to Mr. Hannah's deposition testimony of November 5, 2007.  Mr. Nort sold the VERICHECK mark and business to Mr. Hannah.

10.     Because the court had already determined that Mr. Lahoti used the VERICHECK mark in bad faith, on the second day of the trial the parties agreed that the court could

ORDER – 4

determine statutory damages and attorneys' fees on the existing record without need for trial testimony.

**Vericheck's Business, Its Services, and Consumer Confusion**

11.     In 1992, Mr. Nort started Vericheck in Georgia.  Vericheck was a verification company for check processing that appeared to employ a unique system for tracking account information.

12.     Mr. Hannah met Tom Nort in 1992 or 1993.  In 1995, Mr. Hannah purchased Vericheck from Mr. Nort.  The assets included in the sale were the company's computer programs, computers, processing equipment, and the name Vericheck, Inc.  Mr. Hannah continued to do business as Vericheck and has always used the name Vericheck to brand the company's services.  Mr. Nort thereafter changed the name of his business so that he could offer services that he had not sold to Mr. Hannah as part of the sale of the Vericheck business.  *See* Ex. A-21.

13.     Mr. Nort was called to testify telephonically as a rebuttal witness to challenge Mr. Hannah's deposition testimony that Vericheck had been doing business under the Vericheck name since 1991 or 1992.  Mr. Nort instead corroborated Mr. Hannah's testimony, testifying that Vericheck began offering services in 1991 or 1992 and, when pressed, said that he would have to settle on "around 1992."  Mr. Nort further testified that salesmen used the VERICHECK mark to solicit business in Atlanta, Georgia and the surrounding area, as well as in Gainesville, Georgia.

14.     Mr. Hannah registered Vericheck, Inc. with the State of Georgia on September 7, 1999.  Exs. 4, 5.  He testified credibly that his delay in registering the company was due to the death of one parent and the debilitating illness of his other parent around the same time that he began operating Vericheck.  Vericheck owns a State of Georgia trademark

ORDER – 5

registration, No. S-19547, for the mark VERICHECK & Design, issued August 31, 2001. Ex. A-3.

15.     Vericheck provides a broad array of financial and merchant solutions, including check and other financial verification services; check guarantee services; check collection and prosecution of delinquent payments; verification of account information, balance, and positive or bad/fraudulent account transaction history; monitoring and reporting of check transaction history; payment processing services (credit card, debit card, echecks, electronic benefit transfer ("EBT"), wireless payments, stored value or purchasing cards, and personal or merchant check); and related transactional and technical support services. *See, e.g.*, Exs. A-4, A-9, 4, 5, 15.  The vast majority of Vericheck's business involves automated check handling ("ACH"), which includes prearranged payment debits ("PPD"); commercial cash debits ("CCD"); accounts receivable conversion ("ARC"); telephone transactions; back office conversion ("BOC"); point-of-purchase transactions ("POP"); returned check collection ("RCK"); and consolidated returns ("RCC").  Of these ACH transactions, ARC, BOC, POP, RCK, and RCC depend upon the existence of a physical check.

16.     There are approximately 1,500 merchants conducting electronic transactions through Vericheck.  Its customers include large private corporations such as the home security company ADT, as well as county and city governments, law firms, and professional organizations.  Mr. Hannah testified that Vericheck's sales volume in 1995 was "minuscule," but the company now is involved with approximately $300 million in transactions per year, which translates to approximately 300,000 transactions.  According to Mr. Hannah, in 2001-2002, Vericheck's business "really took off" and the "trajectory

ORDER – 6

was straight up"; this increase in business was related to Vericheck's partnership with USA ePay.  Presently, Vericheck grosses approximately $60,000 per month.

17.     Vericheck promotes its name and services through trade shows; banking shows; and electronic transactions exhibitions in Las Vegas and San Jose; merchant's forums in Eureka, California, southern Tampa, Florida, and Atlanta, Georgia; and vendor groups sponsored by regional and national banks.  Mr. Hannah personally attends two to three trade shows per year, distributing material and business cards, all of which prominently display the VERICHECK mark.  It costs approximately $5,000 to register for a trade show and additional expenses are incurred for setting up a booth.  Vericheck also offers incentives to promote its services, for example, waived application fees for vendors, and asks that its ISOs and resellers participate in promoting these incentives.

18.     Mr. Hannah testified that approximately 90% of Vericheck's business is conducted through the Internet.  This includes Vericheck's secure network and merchant transactions.  Vericheck, its resellers, and ISOs also direct merchants to the website posted at Vericheck's <vericheck.net> to fill out applications, service agreements, and for further information.  Vericheck, its resellers, and ISOs use VERICHECK as a trademark regularly.  *See, e.g.*, Exs. A-4 (using the mark on the website posted at <vericheck.net>), A-9 (using the mark on the website posted at <USAePay.com>).

19.     Mr. Hannah testified that he personally receives two or three calls per day from Vericheck resellers who say that customers are confused by visiting the website posted at <vericheck.com> and cannot find the Vericheck merchant application.  According to Mr. Hannah, these resellers ask what the company is doing to increase Vericheck's presence on the Internet and eliminate the confusion when merchants attempt to locate the

ORDER – 7

Vericheck application online and visit Mr. Lahoti's website posted at <vericheck.com> instead of the website posted at Vericheck's <vericheck.net>.

### The VERICHECK Mark and Distinctiveness

20.     An Arizona company successfully registered VERICHECK as a word mark in 1975. Exs. 7, 8. These registrations were not renewed by the trademark owner and have expired. Exs. 9-10. There is no evidence in the record that the Arizona company ever used the VERICHECK mark.

21.     Mr. Hannah testified credibly that the Arizona company has never and does not presently offer services similar to those of Vericheck. According to Mr. Hannah, the Arizona company is primarily a civil collections firm. Mr. Hannah has spoken with the Arizona company's principal and Vericheck presently has a referral agreement with that company: once checks are processed through the RCK process, Vericheck will refer the "hard collections" to the Arizona company. Mr. Hannah believes that the Arizona company does business under a name other than "Vericheck."

22.     In July 2007, Vericheck applied for registration of the VERICHECK mark. Ex. 30. The PTO recently completed its initial examination of Vericheck's application for registration of the VERICHECK mark, and has approved Vericheck's application for publication for opposition. Ex. A-22. Mr. Lahoti has opposed Vericheck's application.

23.     At trial, Mr. Lahoti testified inconsistently and evasively about his research into the <vericheck.com> domain name. In his answers to interrogatories, Mr. Lahoti stated that he began researching domain names with the "VERI-" prefix in 1998, discovering that <vericheck.com> was, at that time, registered to a Canadian company; searched the PTO's online database, finding that an Arizona company had registered the VERICHECK mark; and then conducted an Internet search, determining that "the

ORDER – 8

Arizona entity was no longer using the alleged mark VERICHECK," and that "a number of other third parties were using terms identical or similar to VERICHECK in connection with their goods or services." Ex. A-23, at 9. Mr. Lahoti testified: (1) he could not verify that his answers to interrogatories were accurate; (2) he may not have verified or reviewed the answers to interrogatories before they were served on opposing counsel; (3) he was unaware of any duty to ensure that his answers were accurate; and (4) his attorney told him that any inaccuracies could be sorted out at trial.

24.     Mr. Lahoti testified that he did an Internet search for "Vericheck" and that the Arizona company did not appear in any of the results. He further stated that he did not take specific notice of Vericheck's presence on the Internet because he was "overwhelmed" by the number of companies doing business on the Internet as "Vericheck."

25.     Mr. Lahoti has earned $724 in revenue from owning <vericheck.com>. He received this revenue from Oversee.net, which pays Mr. Lahoti based upon the number of times a visitor to <vericheck.com> clicks through links on the page. He testified that he did not know how much he earned per click, and could not recall the number of times that visitors clicked through the links. He said that he did not scrutinize the statistics provided by Oversee.net closely enough to hazard a guess as to how his revenue was earned.

26.     Vericheck's use of the VERICHECK mark predates nearly all of the alleged users cited by Mr. Lahoti. Several of the purported third-party uses either are unsupported, irrelevant, or support the distinctiveness of the VERICHECK mark as used by Vericheck to describe its services.

27.     Most of the alleged uses upon which Mr. Lahoti relies are in unrelated services. For example, "VeriCheck Information Services" offers background investigation services, Exs. 20, 21; "Vericheck, Inc." offers pre-employment background services, Exs. 22, 23;

ORDER – 9

VeriCheck provides "Professional Pre-employment Verification Service," Ex. 24; and "VERI-CHECK" offers an ultraviolet counterfeit money detector, Moeller Decl. (Dkt. # 32), Ex. 25.

28.     Mr. Lahoti argued in his trial brief that another company, GLA, Inc., had an earlier use of a "vericheck" designation.  However there is no evidence of record showing any use whatsoever by GLA, Inc. of the mark, and the slim documentation provided by Mr. Lahoti, Ex. 17, indicates that GLA registered the trade name VERICHECK in Hawaii in 1997, at least five years after Vericheck adopted the mark.

29.     Mr. Lahoti also cites VeriChek, Inc., a Texas company, Ex. 13; however, the earliest alleged use of the mark by that company is 1995, at least three years after Defendant adopted the VERICHECK mark.

30.     Mr. Lahoti references three third-party uses that allegedly commenced before Vericheck first adopted the VERICHECK mark in 1992: Credit Associates of Maui; Veri-Cheque of Canada, Ex. 18; and Vericheck Services, Inc. of Arizona, Exs. 7-10.  There is no evidence indicating whether or the extent to which Credit Associates of Maui or Veri-Cheque of Canada actually used and promoted any mark in connection with their services.  The sole evidence presented by Mr. Lahoti concerning Veri-Cheque of Canada's alleged use of a mark are a page printed from an Internet archive from 1998, six years after Defendant adopted its VERICHECK mark, and a page printed from Veri-Cheque's current website in June 2007, fifteen years after Defendant adopted its VERICHECK mark.  Moreover, Veri-Cheque is a Canadian company, and aside from a statement on the website that it operates in "North America" there is no evidence of actual goods or services provided in the United States.

31.     The court finds that the evidence introduced at trial about the Arizona company supports Vericheck's contention that the mark is distinctive.  The Arizona company does

ORDER – 10

not use the mark in connection with services that compete with Vericheck.  Mr. Lahoti's own investigation showed that the company did not use the VERICHECK mark, at least on the Internet, and he has not produced evidence to contradict his own investigation. Furthermore, that the PTO allowed the Arizona company to register the now expired VERICHECK mark without requiring proof of secondary meaning affords a rebuttable presumption that the mark is inherently distinctive for "check verification services."  Ex. 7 (capitalization removed); *see Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 11 (2d Cir. 1976).

32.    The VERICHECK mark has no common English meaning, and appears in no dictionary.  If the term VERICHECK is understood by the average consumer to suggest Vericheck's services, such understanding requires imagination and creativity, or a mental leap by the consumer, in order to become apparent.  The court therefore finds the VERICHECK mark to be inherently distinctive.

33.    Vericheck has also presented substantial proof of the VERICHECK mark's strength in the marketplace in the form of Vericheck's extensive and longstanding use and promotion of the mark as well as the company's expanding territory, client list, and sales figures.

## II.  CONCLUSIONS OF LAW

1**.**    Vericheck has presented facts that establish the distinctiveness of the VERICHECK mark and the likelihood of consumer confusion caused by Mr. Lahoti's use of the mark.  Given that the mark is strong and protectable, Vericheck is entitled to judgment on its five counterclaims: (1) violation of the ACPA; (2) Lanham Act false designation of origin; (3) common law trademark infringement and trade name

ORDER – 11

infringement; (4) common law unfair competition and misappropriation; and (5) violation of the Washington CPA.  Mr. Lahoti's claims are dismissed.

### Counterclaim I: Anti-Cybersquatting Consumer Protection Act

2.      The ACPA, which Congress incorporated into the Lanham Act in 1999, sets forth the elements of a cybersquatting claim.  To prevail, Vericheck must prove that it holds a distinct mark, that Mr. Lahoti had a "bad faith intent to profit" from the mark, and that Mr. Lahoti "register[ed], traffic[ked] in, or use[d][1] a domain name" that is identical to, or confusingly similar to that mark.  *See* 15 U.S.C. § 1125(d)(1)(A)(i)-(ii).  The ACPA protects both federally-registered marks as well as unregistered marks.  *DaimlerChrysler v. The Net Inc.*, 388 F.3d 201, 205 (6th Cir. 2004) (citing *Two Pesos Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)); *see also* 4 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 25:78 (4th ed. 2007) (hereinafter "MCCARTHY").

3.      The Court already concluded that Mr. Lahoti registered and used the domain name <vericheck.com> in bad faith, and that he made commercial use of the mark and Domain Name.  SJ Order at 11-13, 15-16.  Likewise, "[t]here is no dispute that vericheck.com and the VERICHECK mark are identical or confusingly similar."  *Id.* at 6.  Thus the remaining issue for trial was the distinctiveness of the VERICHECK mark.

4.      There are five categories of trademarks: (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; and (5) fanciful.  *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 927 (9th Cir. 2005).  Word marks that are "'arbitrary' ('Camel' cigarettes), 'fanciful' ('Kodak' film), or 'suggestive' ('Tide' laundry detergent)"

---

[1]Unlike a trademark infringement claim, a claim under the ACPA does not require the claimant to prove that the alleged cybersquatter made *commercial* use of the mark.  *See Bosley Medical Institute, Inc. v. Kremer*, 403 F.3d 672, 680-81 (9th Cir. 2005).

ORDER – 12

are inherently distinctive. *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 210-11 (2000). These three categories are entitled to trademark protection because they "serve[ ] to identify a particular source of a product . . . ." *Two Pesos*, 505 U.S. at 768. A term is suggestive "if imagination or a mental leap is required in order to reach a conclusion as to the nature of the product being referenced." *Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*, 198 F.3d 1143, 1147 (9th Cir. 1999). By contrast, "descriptive" marks simply "define a particular characteristic of the product in a way that does not require any exercise of the imagination." *Yellow Cab*, 419 F.3d at 927 (internal citation and quotation omitted). A descriptive mark receives trademark protection only when it establishes "secondary meaning" in the marketplace. *Id.* Generic marks receive no protection because they simply identify the product, rather than the source of the product. *Id.* (internal citation omitted). "Placement on the spectrum of distinctiveness does not end the enquiry as to the strength of a mark: it is only the first step. The second step is to determine the strength of this mark in the marketplace. That is, to ascertain its degree of recognition in the minds of the relevant customer class." 2 McCarthy §11.2.

5.      Vericheck contends that the VERICHECK mark is inherently distinctive and is protectable as a trademark even without evidence of secondary meaning. Also, the VERICHECK mark has acquired distinctiveness in the minds of consumers as a result of Vericheck's long use, advertising and promotion, and extensive sales of Vericheck's financial transaction processing services, all in connection with the VERICHECK mark. Mr. Lahoti contends that the VERICHECK mark is generic or descriptive, and thus either unprotectable under any circumstance, or protectable only on a showing of secondary meaning.

6.      The distinctiveness of a mark must be assessed not in the abstract, but in relation to the applicable goods or services, the context in which the mark is used and

encountered in the marketplace, and the significance the mark in that context is likely to have to the average consumer.  In assessing mark strength, it is improper to dissect a mark and to separately analyze the individual words which it may incorporate.  *See In re Hutchinson Tech., Inc.,* 852 F.2d 552, 554-55 (Fed. Cir. 1988).  A combination of words or word parts in a mark, which might themselves be descriptive if taken separately, are not necessarily descriptive if used as a mark.  *See e.g., Equine Techs., Inc. v. Equitechnology, Inc.*, 68 F.3d 542, 545 (1st Cir. 1995) (holding that "EQUINE TECHNOLOGIES" in its entirety is not descriptive of hoof pads for horses, notwithstanding that "equine" describes horses).

7.      Taken in its entirety, the VERICHECK mark is suggestive.  The term VERICHECK has no common English meaning, and does not appear in any dictionaries.  The VERICHECK mark does not call to mind Vericheck's broad array of financial transaction processing services without need for the exercise of imagination or creativity by the consumer.  Vericheck's long use of the VERICHECK mark as a trademark, and not as a descriptor of its goods and services, also supports the court's finding that the mark is protectable.

8.      Mr. Lahoti improperly breaks down the mark into two component parts, "veri" and "check," in order to argue that consumers will immediately presume that Vericheck provides "check verification" services.  *See e.g.*, *Equine Techs.*, 68 F.3d at 545; *In re Hutchinson Tech.,* 852 F.2d at 554-55.  Even if the mark were parsed, the result would not immediately call to mind the broad array of electronic transaction processing services that Vericheck provides.  "Veri" has no independent meaning and could refer to "*veritas*" ("truth") or "veritable" as easily as "verification."  "Check" could refer to a noun, a verb, an interjection, and has a myriad of meanings.  *See Dictionary.com*, *Dictionary.com Unabridged* (v 1.1), Random House, Inc., *http://dictionary.reference.com/browse/check*

ORDER – 14

1   (last visited November 28, 2007) (referring to 46 separate meanings).  Following Mr.

2   Lahoti's reasoning, the recombinant VERICHECK mark could conceivably describe a

3   process for stopping the truth from being transmitted ("*veritas*" and "check" definition

4   number 1), or a reliable form of checking baggage at the airport ("veritable" and "check"

5   definition number 10).  *See id.*

6

7   9.      Most of Mr. Lahoti's evidence supports a finding that the VERICHECK mark is

8   suggestive, strong, and protectable.  As the court recognized on summary judgment,

9   evidence that "the VERICHECK mark could denote a wide variety of products" supports

10  a finding that the mark "require[s] a consumer's imagination to connect the term to

11  Vericheck's particular services."  SJ Order at 10; *see also Playtex Prods., Inc. v.*

12  *Georgia-Pacific Corp.*, 390 F.3d 158, 164 (2d Cir. 2004) (finding the term "Wet Ones,"

13  like "Wite-Out," to be suggestive because it "could plausibly describe a wide variety of

14  products").  An ultraviolet counterfeit money detector (checking into the truth of the

15  currency) and pre-employment background verification (a verifying background

16  check)—uses which would be suggested by an improper parsing of the VERICHECK

17  mark—differ significantly from the many financial services offered by Vericheck .  *See,*

18  *e.g.*, Moeller Decl., Ex. 25; Exs. 22.

19

20  10.     Similarly, evidence that the Arizona company obtained two trademark registrations

21  (now expired) for marks incorporating the term VERICHECK plus a design component

22  indicates that the PTO did not consider the mark to be descriptive or generic as applied to

23  that company's services.  *See* 2 MCCARTHY § 11:69 (citing *Borinquen Biscuit Corp. v.*

24  *M.V. Trading Corp.*, 443 F.3d 112, 119-20 (1st Cir. 2006) (holding that the PTO's

25  acceptance of other marks incorporating the same term for a registration supports the

26  inherent distinctiveness of the mark at issue)); *see, e.g.*, Ex. 7 (Arizona company's

27

28

ORDER – 15

registration of VERICHECK mark for "check verification services") (capitalization removed).

11.     Mr. Lahoti argues that the VERICHECK mark has been rendered weak and, therefore, unprotectable by a crowded field of third-party use of the mark.  However, most of the alleged third-party uses cited by Mr. Lahoti are in unrelated fields, and "[e]vidence of other unrelated potential infringers is irrelevant to claims of trademark infringement and unfair competition under federal law."  *Eclipse Assocs. Ltd. v. Data Gen. Corp.*, 894 F.2d 1114, 1119 (9th Cir. 1990); *see also Electropix v. Liberty Livewire Corp.*, 178 F. Supp. 2d 1125, 1130 (C.D. Cal. 2001) (rejecting relevance of trademark report showing 200 companies using the mark where only two of the companies were using the mark in the same or a similar industry).

12.     Mr. Lahoti cites three prior users of the mark in the same industry as Vericheck: Credit Associates of Maui, Veri-Cheque of Canada, and Vericheck Services, Inc. of Arizona.  Federal registration of the mark by a single company, along with scant evidence about two other purported users, constitute a far cry from a multitude of registrations and uses that might suggest a weak mark.  *See, e.g.*, *Petro Stopping Centers, L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 94 (4th Cir. 1997) (referring to 2,700 companies, 117 third-party federal registrations, 63 users within the same product area, and 42 prior registrations of the mark "PETRO" supported a finding that plaintiff had a weak mark); *Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1511 (2d Cir.1997) (holding that weakness of mark was demonstrated by over 70 trademark registrations, pending applications for registration or renewal, or publications-for-opposition that included the term used in plaintiff's mark); *Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988) (approving district court's finding of a relatively weak mark where "[m]ost other pageants use a mark which is composed of a marital prefix and

ORDER – 16

a defining geographic term.  As a result any combination of a marital prefix and geographic term 'means' beauty pageant."), *abrogation recognized, Eclipse Assocs.,* 894 F.2d at 1116 n.1 (referring to the standard of review); *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 259-60 (5th Cir. 1980) (holding relevant the evidence of 72 third-party uses and registrations of the appellant's mark); *cf.* 3 MCCARTHY § 17:17 (noting that third-party use and a plaintiff's failure to police a mark are relevant as to whether widespread use has led to the weakening of the mark).

13.     Mr. Lahoti presented no credible evidence that Credit Associates of Maui, Veri-Cheque of Canada, and Vericheck Services, Inc. of Arizona have used the VERICHECK mark in the United States to compete with Vericheck.  Mr. Lahoti never attempted to admit at trial his exhibit verifying Credit Associates of Maui's use of the VERICHECK mark, Ex. 16, and no reference to the VERICHECK mark is navigable from that company's website.  *See* http://www.creditassoc.com/ (last accessed November 28, 2007).

14.     There is no credible evidence of Veri-Cheque of Canada's use of the VERICHECK mark prior to Vericheck's use in 1992, and there is no evidence of the Canadian company's use of the mark in the United States.  Trademark rights are territorial in nature, and possible use outside the United States does not bear on the protectability of the VERICHECK mark in this country.  "Priority of trademark rights in the United States depends solely upon priority of use in the United States, not on priority of use anywhere in the world."  *Grupo Gigante SA De CV v. Dallo & Co., Inc.*, 391 F.3d 1088, 1093 (9th Cir. 2004) (quoting 4 MCCARTHY § 29:2).

15.     The evidence presented with respect to the Arizona company supports Vericheck's position.  Mr. Lahoti failed to present any evidence whatsoever that the Arizona company actually used the VERICHECK mark to compete with Vericheck's services.  Mr. Lahoti

ORDER – 17

testified that his own independent Internet search verified that the Arizona company was not using the mark, at least on the Internet.  That the PTO allowed the Arizona company to register the now expired VERICHECK mark without requiring proof of secondary meaning affords a rebuttable presumption that the mark is inherently distinctive.  *See Abercrombie & Fitch Co.*, 537 F.2d at 11.  Furthermore, Mr. Hannah's unrebutted testimony established that: (1) Vericheck has a continuing business relationship with the Arizona company; (2) the Arizona company does not offer the same services as Vericheck; and (3) the Arizona company does not use the VERICHECK mark.

16.     Mr. Lahoti argues, nonetheless, that the Arizona company's prior registration of the VERICHECK mark, without any evidence of the company's use of the mark, precludes Vericheck's ability to raise counterclaims against him.  He relies upon the principle that a senior registrant's prior registration of a mark on the PTO's Principal Register constitutes prima facie evidence of the validity of the registered mark and of the senior registrant's exclusive right to use the mark on the goods and services specified in the registration.  *See* 15 U.S.C. §§ 1057(b), 1115(a); *Brookfield Commun'ns v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1047 (9th Cir. 1999).

17.     Mr. Lahoti's argument is a *jus tertii* defense, i.e., he asserts that a third party, the Arizona company, has rights superior to Vericheck and, therefore, "[s]omebody has a right to sue me, but it's not you." 6 MCCARTHY § 31:157 (internal marks omitted).  Modern courts and the Trademark Board have rejected the *jus tertii* defense.  *Id.* § 31:160; *see Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 820 (9th Cir. 1996) ("[A] third party's prior use of a trademark is not a defense in an infringement action."); *Bishops Bay Founders Group, Inc. v. Bishops Bay Apartments, LLC*, 301 F. Supp. 2d 901 (W.D. Wis. 2003) (holding that whether a third party might have trademark rights superior to plaintiff "has no effect on this lawsuit"); *General Cigar Co. v. G.D.M.*

ORDER – 18

*Inc.*, 988 F. Supp. 647, (S.D.N.Y. 1997) (holding that a third party's possibly superior rights cannot be a defense); *Krug Vins Fins de Champagne v. Rutman Wine Co.*, 197 U.S.P.Q. 572, 574 (T.T.A.B. 1977) ("The fact that the third persons might possess some rights in their respective marks which they could possibly assert against petitioner in a proper proceeding can avail respondent nothing herein since respondent is not in privity with nor is the successor in interest to any rights which such persons have acquired in their marks."). This court follows suit. Mr. Lahoti acquired rights to the Domain Name more than a decade after Vericheck began using the mark. "So long as plaintiff proves rights superior to defendant, that is enough. Defendant is no less an infringer because it is brought to account by a plaintiff whose rights may or may not be superior to the whole world." 6 MCCARTHY § 31:160; *Comm. for Idaho's High Desert*, 92 F.3d at 821 (citing MCCARTHY).

18.     In sum, the court finds the VERICHECK mark to be suggestive and, therefore, inherently distinctive. The mark's strength in the marketplace is amply supported by Vericheck's long use of the mark; the mark's promotion through advertising, trade shows, and promotional incentives; and the expansion of Vericheck's territory and client list along with an increase in sales. The VERICHECK mark is therefore entitled to protection. Because Vericheck has already satisfied the other elements under the ACPA, the court grants judgment in favor of Vericheck on its ACPA counterclaim.

## Counterclaims II, III, and IV: Infringement Claims

19.     To prevail on its claims of false designation of origin, common law trademark infringement, and unfair competition (collectively, "infringement claims"),[2] Vericheck

---

[2]The familiar "likelihood of confusion" test is the standard for liability, whether the claim is one for unfair competition, false designation of origin, or infringement. *See New West Corp. v. NYM Co. of Cal., Inc.*, 595 F.2d 1194, 1201 (9th Cir.1979) ("Whether we call the violation

must show that it holds a protectable mark, and that Mr. Lahoti made commercial use of a mark that is similar enough to cause confusion in the minds of consumers about the origin of the goods or services in question. *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 117 (2004). At summary judgment, the court found that Mr. Lahoti made commercial use of the VERICHECK mark, and has determined, above, that Vericheck holds a protectable mark. The remaining element of Vericheck's infringement claims is, therefore, whether Mr. Lahoti's use of the mark was likely to cause confusion in the minds of consumers. *See Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1355 n.5 (9th Cir. 1985) (noting that "the question of likelihood of confusion is routinely submitted for jury determination as a question of fact").

20.     The following eight factors first announced in *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979), guide the court's analysis on likelihood of confusion:

> (1)  the similarity of the marks;
> (2)  the marketing channels used to promote the marks;
> (3)  the relatedness of the goods or services promoted under the marks;
> (4)  the strength of the plaintiff's mark;
> (5)  evidence of actual confusion;
> (6)  likelihood of expansion of either parties' product lines;
> (7)  the degree of care a potential purchaser is likely to exercise; and
> (8)  the defendant's intent in selecting the mark.

In the context of the Web, the three most important *Sleekcraft* factors for determining likelihood of confusion are (1) similarity of the marks, (2) relatedness of the goods or services, and (3) the simultaneous use of the Web as a marketing channel. *Goto.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000).

---

infringement, unfair competition or false designation of origin, the test is identical – is there a 'Likelihood of Confusion?'"); *see also* 4 MCCARTHY § 23:1 (same as to common law trademark infringement).

ORDER – 20

21.     Application of the *Sleekcraft* Internet troika shows that confusion is likely.  First, the court has already determined that the VERICHECK mark and <vericheck.com> are identical or confusingly similar.  *See* SJ Order at 6, 17.

22.     Second, Mr. Lahoti uses the Internet in connection with competing services. Vericheck uses the mark in connection with financial transaction processing services. Mr. Lahoti uses the Domain Name in connection with a "directory"-style website that includes links to companies offering services that compete with those of Vericheck, such as <safepayment.com>, as well as to web sites that offer "Online Payments" and "Merchant Processing."  Ex. A-10, at 110, 111, 113; *see* SJ Order at 15.

23.     Third, both Mr. Lahoti and Vericheck use the Internet as a marketing channel. The crux of Vericheck's business is merchants', ISOs', and resellers' ability to easily access Vericheck's website in order to facilitate the provision of Vericheck's services. Many of these customers and affiliates, in attempting to reach Vericheck's website and to access Vericheck's services, would — and do — naturally type <vericheck.com> and would and are immediately sent to Mr. Lahoti's competing website.  *See also* SJ Order at 15.

24.     As discussed earlier, the mark is inherently distinctive and the strength of the VERICHECK mark is supported by Vericheck's long and substantial use of the mark since at least 1992; the company's expansion nationwide; its fulfillment of hundreds of thousands of financial transactions worth millions of dollars; and substantial advertising and promotion of the mark by Vericheck, its resellers, and ISOs through the Internet, in print and electronic advertising, and through participation in industry trade shows.

25.     The remaining *Sleekcraft* factors either favor Vericheck or are neutral.  Though uncorroborated, Mr. Hannah presented credible testimony that he received two to three calls per day from Vericheck resellers about merchant confusion regarding the

ORDER – 21

<vericheck.com> website.  Neither party presented evidence regarding the likelihood of expansion into other product lines, though Mr. Lahoti testified that he discussed licensing the VERICHECK mark from the Hawaiian company GLA, Inc. for unspecified purposes. This factor is nonetheless irrelevant here.  *See Victoria's Secret Stores v. Artco Equip. Co.*, 194 F. Supp. 2d 704, 728 (S.D. Ohio 2002) (holding that likelihood of expansion of product lines irrelevant where parties already directly compete).  Exercising an average degree of care, a potential purchaser could conceivably visit <vericheck.com> instead of <vericheck.net> and consequently become frustrated or confused by the myriad links found there.  *See Electropix v. Liberty Livewire Corp.*, 178 F. Supp. 2d 1125, 1134 (C.D. Cal. 2001) ("[V]irtually no amount of consumer care can prevent confusion where two entities have the same name.").  Finally, the court has already found that Mr. Lahoti acted with bad faith intent in selecting the mark.  SJ Order at 12-14.

26.     The court grants judgment in favor of Vericheck on the infringement claims: Lanham Act false designation of origin; common law trademark infringement and trade name infringement; and common law unfair competition and misappropriation.

**Counterclaim V: Washington Consumer Protection Act**

27.     To prevail on its CPA claim, Vericheck must show: (1) an unfair or deceptive act or practice; (2) occurring in the conduct of trade or commerce; (3) affecting the public interest; (4) injuring its business or property; and (5) a causal link between the unfair or deceptive act and the injury suffered.  *Nordstrom, Inc. v. Tampourlos*, 733 P.2d 208, 210 (Wash. 1987).  The court already has determined that Mr. Lahoti's registration and use of <vericheck.com> constitute use in commerce.  SJ Order at 15-16.

28.     Absent unusual or unforeseen circumstances, the analysis of a CPA claim will follow that of the trademark infringement and unfair competition claims: it will turn on the likelihood of consumer confusion regarding a protectable mark.  *See Seattle*

ORDER – 22

*Endeavors,* 868 P.2d 120, 127 (1994) (citing *Nordstrom, Inc. v. Tampourlos,* 733 P.2d 212 (1987) (noting that confusion of the public sufficient to meet the public interest requirement of the CPA)).

29.     The court grants judgment in Vericheck's favor on its CPA counterclaim for the reasons discussed earlier: the VERICHECK mark is strong and inherently distinctive and Mr. Lahoti intentionally infringed the VERICHECK mark by his registration and use of the <vericheck.com> domain name, which confused and diverted Vericheck's customers.

### Mr. Lahoti's Affirmative Defenses

30.     All but one of the affirmative defenses raised by Mr. Lahoti fail in light of the proof offered by Vericheck in support of its counterclaims.  *See* Pretrial Order at 2-3 (Dkt. # 71).  Mr.  Lahoti's only remaining affirmative defense, that Vericheck's claims are barred by the doctrine of "unclean hands," is unsupported in fact or law.

31.     The equitable defense of unclean hands is a defense to a Lanham Act infringement suit.  *See Fuddruckers, Inc. v. Doc's B.R. Others, Inc.,* 826 F.2d 837, 847 (9th Cir. 1987).  The party seeking application of the doctrine of unclean hands "must demonstrate that the plaintiff's conduct is inequitable and that the conduct relates to the subject matter of its claims."  *See Levi Strauss & Co. v. Shilon*, 121 F.3d 1309, 1313 (9th Cir. 1997) (quoting *Fuddruckers*).

32.     Mr. Lahoti argues that Vericheck's counterclaims are barred by the doctrine of unclean hands because Vericheck was not justified in adopting the VERICHECK mark in light of the Arizona company's registration of the VERICHECK mark.  This argument is essentially the *jus tertii* defense the court has already rejected.  Regardless, nothing on the record supports Mr. Lahoti's position.  As Mr. Hannah testified, he is and was aware of the Arizona company, and knows that it does not and has not offered services that compete with those of Vericheck.  Mr. Lahoti himself stated that he conducted an Internet search and concluded, "the Arizona entity was no longer using the alleged mark

ORDER – 23

VERICHECK.**"**  Ex. A-23 at 9.  The two registrations issued to the Arizona company have expired.  *See* Exs. 7-8 (trademark registration records), 9-10 (status reports for cancelled trademark registrations).  The court therefore rejects Mr. Lahoti's affirmative defense of unclean hands.

**Relief Sought by Vericheck**

**Vericheck is entitled to an injunction, including mandatory transfer of the <vericheck.com> domain name to Vericheck**

33.    "Injunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement."  *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988); 15 U.S.C. § 1116 (injunctive relief for violation of Lanham Act 43(a) or (d)); RCW § 19.86.090 (injunctive relief for violation of Washington CPA).  Section 43(d) of the Lanham Act specifically authorizes district courts to order transfer of an infringing domain name to the mark owner.  "In any civil action involving the registration, trafficking, or use of a domain name under this paragraph, a court may order . . . the transfer of the domain name to the owner of the mark."  15 U.S.C. § 1125(d)(1)(C).

34.    Vericheck is entitled to an injunction against Mr. Lahoti, prohibiting him and his affiliates from using the term VERICHECK in any manner, including as a domain name, and requiring him to transfer the <vericheck.com> domain name to Vericheck.  The injunction sought is narrowly tailored to address the specific harm that is suffered by Vericheck and to remedy actual and likely consumer confusion caused by Mr. Lahoti's acts.

35.    The court directs Vericheck to file a proposed order for injunctive relief within ten days.

ORDER – 24

**Vericheck is entitled to an award of statutory damages**

36.     Vericheck requests statutory damages of $100,000 on its cybersquatting claim. 15 U.S.C. § 1117(d) provides that "[i]n a case involving a violation of section 1125(d)(1) of this title, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits, an award of statutory damages in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court considers just."

37.     Vericheck is entitled to the maximum amount of statutory damages, $100,000, based on the totality of facts in this case including, without limitation, Mr. Lahoti's bad faith and his deliberate and knowing acts, his pattern and practice of registering domain names that incorporate the trademarks of others, his efforts to extort thousands of dollars in exchange for transfer of the Domain Name, his disregard for the submission of inaccurate answers to interrogatories, and the actual confusion which is occurring in the marketplace as a result of Mr. Lahoti's use of the Domain Name in connection with a commercial website offering links to third parties that compete with Vericheck.  *See*, *e.g.*, *Elec. Boutique Holdings Corp. v. Zuccarini*, 56 U.S.P.Q.2d 1705, 1710 n.11, 1713-14 (E.D. Pa. 2000) (awarding $100,000 statutory damages per domain name with $27,487 attorneys' fees against "notorious cybersquatter" who "thumbs his nose at the rulings of this court and the laws of our country"); *Mirage Resorts, Inc. v. Cybercom Prods.*, 228 F. Supp. 2d 1141, 1142-43 (D. Nev. 2002) (awarding statutory damages on default of $100,000, plus $13,763 attorneys' fees, and $1,000 for corrective advertising); *Graduate Mgmt. Admission Council v. Raju*, 267 F. Supp. 2d 505, 512-13 (E.D. Va. 2003) (awarding statutory maximum of $100,000 per domain name in addition to other remedies); *Pinehurst, Inc. v. Wick*, 256 F. Supp. 2d 424, 433 (M.D.N.C. 2003) (awarding statutory damages of $50,000 per domain name plus attorneys' fees and costs based on defendant's willful and deliberate conduct).

ORDER – 25

## Vericheck is entitled to an award of its attorneys' fees and costs

38.     An award of Vericheck's attorneys' fees and costs is authorized by the Washington CPA, which provides for an award of attorneys' fees and costs to prevailing plaintiffs.  RCW § 19.86.090.

39.     Vericheck also seeks recovery of its reasonable attorneys' fees because this is an "exceptional" case under 15 U.S.C. § 1117(a).  The Lanham Act permits an award of reasonable attorneys' fees to prevailing plaintiffs[3] for violations of 15 U.S.C. § 1125(a) and § 1125(d) in "exceptional cases." 15 U.S.C. § 1117(a).  "Exceptional" is defined as "malicious, fraudulent, deliberate or willful."  *Gracie v. Gracie*, 217 F.3d 1060, 1068 (9th Cir. 2000) (citation omitted); *see Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1409 (9th Cir. 1993).

40.     Mr. Lahoti's acts include: willful registration and use of the Domain Name; attempts to extort thousands of dollars from Vericheck in exchange for the Domain Name; disregard of Vericheck's trademark rights notwithstanding his clear knowledge and actual notice of them; a pattern and practice of cybersquatting, including a pattern and practice of abusive litigation practices as a means to convince trademark owners to drop their domain name claims or to pay for domain names; and his disregard for the submission of inaccurate answers to interrogatories.  Such conduct renders this an "exceptional" case.  *See, e.g.*, *Elec. Boutique*, 56 U.S.P.Q.2d 1705; *Mirage Resorts,* 228 F. Supp. 2d 1141; *Pinehurst*, 256 F. Supp. 2d 424; Jost Decl., Ex. B, at 36-37, 42-43 (finding, *in E-Stamp Corp. v. Lahoti*, that case was exceptional and awarding attorneys fees where Mr. Lahoti engaged in pattern and practice of registering domain names with a bad faith intent to profit from them); *E-Stamp Corp. v. Lahoti*, Case No. 2:99-CV-9287-GAF-MAN, Judgment on Court Trial and Permanent Injunction, at 2 (C.D. Cal. Aug. 1,

---

[3] Here, although technically the defendant, Vericheck is in the position of plaintiff.

ORDER – 26

2000) (awarding $305,612,20 in attorneys' fees based on exceptional nature of Mr.

Lahoti's conduct).

41.     The court grants Vericheck leave to submit a tabulation of its attorneys' fees and

costs in this matter.

            Dated this 3rd day of December, 2007.


                                        _____
                                        JAMES L. ROBART
                                        United States District Judge

ORDER – 27