**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DAVID LAHOTI, an individual,
                    *Plaintiff-Appellant,*

v.

VERICHECK, INC, a Georgia
Corporation,
                    *Defendant-Appellee.*

No. 08-35001

D.C. No.
CV-06-01132-JLR

OPINION

Appeal from the United States District Court
for the Western District of Washington
James L. Robart, District Judge, Presiding

Argued and Submitted
March 9, 2009—Seattle, Washington

Filed November 16, 2009

Before: William A. Fletcher, Ronald M. Gould, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Gould

15233

## COUNSEL

Derek A. Newman, Randall Moeller, and John Du Wors, Newman & Newman, Attorneys at Law, LLP, Seattle, Washington, for the plaintiff-appellant.

Shannon M. Jost and Aviva Kamm, Stokes Lawrence, P.S., Seattle, Washington, for the defendant-appellee.

---

## OPINION

GOULD, Circuit Judge:

David Lahoti appeals the district court's bench trial judgment that his use of the "VeriCheck" Georgia state service mark owned by Vericheck, Inc. violated the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), the Lanham Act, 15 U.S.C. §§ 1051 et seq., the Washington Consumer Protection Act ("WCPA"), Wash. Rev. Code § 19.86, and various Washington common law doctrines. Lahoti, who has previously been found liable for cybersquatting activities, obtained the domain name "vericheck.com," but did not use the website to offer any goods or services. We conclude that the district court's factual decision that the "VeriCheck" mark was a distinctive, legally protectable mark under the ACPA and federal trademark law was based in part on reasoning contrary to federal trademark law and based in part on reasoning that could support the district court's conclusion. Because we believe the district court should decide the issue of distinctiveness in light of the principles we explain, we vacate the district court's opinion and remand for further proceedings not inconsistent with this opinion.

## I

Vericheck, Inc. ("Vericheck") is a Georgia corporation that provides electronic financial transaction processing services, including check verification, check guarantee, check collection, account verification, automated check handling, and payment processing services. Vericheck has advertised itself on its website as "[t]he leader in Check Verification and Guaran-

tee Services," and check verification underlies a large part of its operations. Vericheck operates a website at vericheck.net and also owns the domain names vericheck.org, vericheck.cc, vericheck.us and vericheck.biz. Vericheck unsuccessfully attempted to secure the vericheck.com domain name (the "Domain Name") from a Canadian company in 1999.

In 2001 Vericheck gained a Georgia state registration for its service mark,[1] which consists of a checkmark over the word "VeriCheck" (the "Disputed Mark"). The Georgia registration states that the mark is used in connection with "Check Verification and Check Collection Services." Vericheck tried to obtain federal registration of the Disputed Mark, but in 2003 the United States Patent and Trademark Office ("PTO") denied the application because an Arizona company (the "Arizona Company") had already registered a "Vericheck" trademark (the "Arizona Mark") for use with "check verification services." The Arizona Company first obtained federal registration in 1975 and renewed its mark in 1996. The Arizona Company did not use the Arizona Mark in connection with services that compete with Vericheck, and there is no evidence that the Arizona Mark was used on the Internet. The Arizona Company did not further renew its registration in 2006, and its mark expired while this case was pending.

David Lahoti considers himself an "Internet entrepreneur." Lahoti claims that in the late 1990s he contemplated going into the business of transaction verification and security. As a preliminary move, as he tells it, he began registering a number of domain names with the "veri-" prefix. Lahoti successfully acquired the vericheck.com domain name in 2003, but he never developed a transaction verification service. Instead,

---

[1]Under the Lanham Act, "the only difference between a trademark and a service mark is that a trademark identifies goods while a service mark identifies services. Service marks and trademarks are governed by identical standards . . . ." *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1156 (9th Cir. 2001) (citations omitted).

the vericheck.com website consisted only of a few lines of code redirecting visitors to a different website with search result links, including links to Vericheck's competitors. Lahoti earned income when visitors to vericheck.com clicked on links at the website to which they were redirected.

Vericheck frequently received calls from its customers complaining that they were confused because they visited vericheck.com but could not find information on Vericheck. Lahoti told the district court that before registering the Domain Name in 2003 he performed a trademark search and Internet search and he concluded that his use of the Domain Name would not be a trademark issue. He also said that when he reserved the Domain Name he was not aware of Vericheck's existence.

This case does not reflect the first time Lahoti has registered domain names that were similar to the names or trademarks of other companies.[2] Lahoti had previously registered more than four hundred domain names containing the trademarks of other companies, including nissan.org, 1800mat-

---

[2]Lahoti's past condemnation as a cybersquatter has no bearing on the classification of Vericheck's Disputed Mark as suggestive, and thereby distinctive, or merely descriptive, and thereby not entitled to trademark protection. As one example, the text of the ACPA states that a cybersquatter is liable if he or she uses a domain name that "in the case of a mark *that is distinctive* at the time of registration of the domain name, is identical or confusingly similar to that mark." 15 U.S.C. § 1125(d)(1)(A) (emphasis added). Similarly, the distinctiveness of the Disputed Mark is a prerequisite to claims of trademark infringement under federal and state law trademark claims. *See generally* 2 McCarthy on Trademarks and Unfair Competition § 11:2 (4th ed.).

However, we would be remiss if we did not note Lahoti's cybersquatting activities, because they are relevant under the ACPA to whether a person acted in bad faith. *See* 15 U.S.C. § 1125(d)(1)(B)(i)(VIII) (providing that in evaluating bad faith under the ACPA, courts should consider "the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive").

tress.com, and ebays.com. In at least two cases, the United Nations World Intellectual Property Organization ordered Lahoti to give up control of some of his domain names because they infringed on a trademark. In 2000 the United States District Court for the Central District of California in *E-Stamp Corp. v. Lahoti* (the "E-Stamp Case"), No. CV-99-9287, concluded that Lahoti was a "cybersquatter" and that his registration, attempted sale, and use of the estamps.com domain name violated federal trademark law and the ACPA.

In 2004 Vericheck contacted Lahoti and offered to purchase the vericheck.com domain name. Doubtless this fit into Lahoti's business plan as an Internet entrepreneur. Lahoti first asked for $72,500, and then reduced his demand to $48,000, but negotiations soon ended. In 2006 Vericheck filed an arbitration complaint pursuant to the Uniform Domain-Name Dispute-Resolution Policy. The arbitrator ordered the transfer of the Domain Name to Vericheck, but instead of complying, Lahoti sought a declaratory judgment in the district court that he did not violate the Lanham Act's cybersquatting or trademark infringement provisions. Vericheck counterclaimed that Lahoti's actions violated the Lanham Act, the ACPA, the WCPA, and Washington state common law. Thus the issues were first framed in the district court.

Both parties moved for summary judgment. The district court granted summary judgment to Vericheck, but only on the question of whether Lahoti acted in bad faith. The district court found that Lahoti did not use the Domain Name to sell goods or services or for a legitimate non-commercial use, and it stated that the Domain Name linked to several of Vericheck's competitors. It also noted Lahoti's past cybersquatting activities. The district court concluded that Lahoti "acted in a bad faith attempt to profit" from his use of the Domain Name and that no reasonable jury could decide otherwise.

After a bench trial on the remaining issues, the district court decided for Vericheck on all claims and counterclaims.

LAHOTI v. VERICHECK, INC

The district court determined that the Disputed Mark was inherently distinctive, which was necessary for Vericheck to prevail on any of its trademark or ACPA claims. The district court concluded that Vericheck had established the other elements of its counterclaims, granted Vericheck injunctive relief and statutory damages, and awarded Vericheck attorneys' fees under both the WCPA and the Lanham Act. Lahoti appeals the district court's merits decision and its award of attorneys' fees.

## II

[1] This case turns in large part on the standard of review. We have previously held that a district court's classification of a trademark's strength is a factual determination to which we apply clear error review. *See Jockey Club, Inc. v. Jockey Club of Las Vegas, Inc.*, 595 F.2d 1167, 1168 (9th Cir. 1979) (stating that "the strength or weakness of the mark in question" is a "factual issue[ ]" that is "not to be set aside unless clearly erroneous"); *Norm Thompson Outfitters, Inc. v. Gen. Motors Corp.*, 448 F.2d 1293, 1294 (9th Cir. 1971) (reviewing "[w]hether the trial court was clearly erroneous in finding as facts . . . [t]hat the slogan is descriptive, rather than a suggestive slogan, or a coined, arbitrary, or fanciful slogan").[3]

_____

[3]Every other circuit that has considered the question has also held that the clear error standard applies. *See, e.g.*, *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1039-40 (2d Cir. 1992) ("[T]he initial classification of a mark to determine its eligibility for protection is a question of fact left to the determination of the district court. We will substitute our own judgment on the matter for that of the district court only if the district court's determination is clearly erroneous."); *Anheuser-Busch Inc. v. Stroh Brewery Co.*, 750 F.2d 631, 635 (8th Cir. 1984) ("[T]he categorization of a term for which trademark protection is claimed is considered to be a factual issue, and thus is to be reviewed under the clearly erroneous standard . . . ." (citation omitted)); 2 McCarthy on Trademarks § 11:3 ("The vast majority of courts has held that categorization of a term on the spectrum of distinctiveness is a factual issue which can be reversed by a federal appellate court . . . only if found to be clearly erroneous." (citing cases from nine circuits)).

Under the clear error standard, "we defer to the lower court's determination unless, based on the entire evidence, we are possessed of a 'definite and firm conviction that a mistake has been committed.' " *SEC v. Rubera*, 350 F.3d 1084, 1093 (9th Cir. 2003) (quoting *Easley v. Cromartie*, 532 U.S. 234, 242 (2001)). "So long as the district court's view of the evidence is plausible in light of the record viewed in its entirety, it cannot be clearly erroneous, even if the reviewing court would have weighed the evidence differently had it sat as the trier of fact." *Id.* at 1093-94 (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985)).

**[2]** When reviewing for clear error, we do not defer to a district court's categorization of a mark if its decision is based on incorrect law. *See Forum Corp. of N. Am. v. Forum, Ltd.*, 903 F.2d 434, 439 (7th Cir. 1990) (stating that a review of a district court's trademark classification must "toe a line between reweighing the evidence and disregarding our responsibility to make sure that the district court's trademark classification was based on correct legal standards"); *Anheuser-Busch Inc. v. Stroh Brewery Co.*, 750 F.2d 631, 635-38 (8th Cir. 1984) (reviewing the district court's trademark categorization *de novo* for legal error before applying clear error review). Although we may affirm on "any ground supported by the record, even if it differs from the district court's rationale," *Lambert v. Blodgett*, 393 F.3d 943, 965 (9th Cir. 2004), where it is unclear whether the district court relied on proper law, we may vacate the judgment and remand with instructions to apply the correct legal standard. *See United States v. Pintado-Isiordia*, 448 F.3d 1155, 1158 (9th Cir. 2009).

## III

**[3]** To show trademark infringement, Vericheck "must demonstrate that it owns a valid mark, and thus a protectable interest," and it must show that Lahoti's "use of the mark 'is likely to cause confusion, or to cause mistake, or to

deceive.' " *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 602 (9th Cir. 2005) (quoting 15 U.S.C. § 1114(1)(a) & (b)). Federal trademark registration is not a prerequisite for protection under the Lanham Act, and for infringement claims such as Vericheck's, "the same standard applies to both registered and unregistered trademarks." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1204 n.3 (9th Cir. 2000) (quotation omitted). On its ACPA claim, Vericheck also must prove that Lahoti acted "with a bad faith intent to profit" from the Disputed Mark. 15 U.S.C. § 1125(d)(1)(A)(i).

On appeal Lahoti challenges the district court's determination that the Disputed Mark is a distinctive and valid mark; he argues that the district court clearly erred in finding that his actions created a likelihood of consumer confusion; he challenges the district court's conclusion that he acted in bad faith; and he argues that the district court erred by awarding Vericheck attorneys' fees.

## A

[4] Vericheck cannot prevail on its trademark claims unless its Disputed Mark is distinctive. *See Disc Golf Ass'n v. Champion Discs, Inc.*, 158 F.3d 1002, 1005 (9th Cir. 1998) ("To recover for the infringement of a trademark . . . [the plaintiff] had to prove that . . . the design is inherently distinctive or acquired distinctiveness through a secondary meaning . . . ."); 2 McCarthy on Trademarks § 11:2 ("Without achieving distinctiveness . . . a designation does not have the legal status of a 'trademark' or 'service mark.' No distinctiveness—no mark."). Distinctiveness is also required to sustain an ACPA claim. 15 U.S.C. § 1125(d)(1)(A)(ii) (establishing liability "in the case of a mark that is distinctive at the time of registration of the domain name"). "Suggestive," "arbitrary," or "fanciful" marks are inherently distinctive, but a mark that is "generic," or one that is "descriptive" and lacks a secondary meaning, is not distinctive and does not receive trademark protection. *Two*

*Pesos*, 505 U.S. at 768. The district court determined that the Disputed Mark is suggestive and thus distinctive, and on appeal Lahoti contends that the Mark is descriptive.**⁴**

Deciding whether a mark is distinctive or merely descriptive "is far from an exact science" and is "a tricky business at best." *Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 489 (2d Cir. 1988); *see also* 2 McCarthy on Trademarks § 11:2 ("As with tonal shade variations in the colors of the visible spectrum of sunlight, the categories of the trademark spectrum often become difficult to distinguish at the boundaries."). Some cases pose an easy conclusion that a mark is merely descriptive, as for example would be the case if a restaurant chain sought a trademark in a name such as "Delicious Foods," or a taxicab company sought a trademark in the name "Reliable Cab," or a clothing company in a name such as "Ready Wear." Other marks are just as plainly distinctive, as for example in fanciful marks where the letters do not form a word in the dictionary and there is no apparent logical connection to the goods, such as Exxon gas or Xerox copiers. But legions of trademark lawyers can stay busy arguing about how marks in the middle, not so plainly descriptive, nor so plainly distinctive, should be categorized. *See Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1528 (4th Cir. 1984) ("The line between descriptive and suggestive marks is scarcely 'pikestaff plain' and the distinction to be given the two terms is frequently made on an intuitive basis rather than as a result of a logical analysis susceptible of articulation." (alteration and quotation omitted)).

We have said that the "primary criterion" for distinguishing between a suggestive and a descriptive mark "is the imagina-

---

**⁴**Because the district court determined that the Disputed Mark was suggestive, it did not analyze whether the Mark had secondary meaning. Additionally, because "suggestive" and "distinctive" are terms of art and the issue is whether the Disputed Mark was suggestive and thus distinctive, we use the terms interchangeably for the purposes of this appeal.

tiveness involved in the suggestion, that is, how immediate and direct is the thought process from the mark to the particular product." *Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59 F.3d 902, 911 (9th Cir. 1995) (quotation omitted). A mark is suggestive "if 'imagination' or a 'mental leap' is required in order to reach a conclusion as to the nature of the product being referenced." *Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*, 198 F.3d 1143, 1147 n.3 (9th Cir. 1999). By contrast, a mark is descriptive if it "define[s] a particular characteristic of the product in a way that does not require any exercise of the imagination." *Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove, Inc.*, 419 F.3d 925, 927 (9th Cir. 2005).

But after taking note of the general rule of law that a mark is suggestive if it takes imagination or a mental leap to identify the referenced product, and applicable guiding principles, a trier of fact is still left with a hard task of judgment. Where does "VeriCheck" fall in the continuum between marks that are plainly suggestive, and therefore distinctive, and those that are plainly distinctive? As the reviewing court, our role is limited to determining whether the district court clearly erred in deciding that the Disputed Mark was suggestive in the context of Vericheck's financial transaction processing services, which include check verification services.

Both parties support their arguments with references to other appellate decisions on distinctiveness. However, as with other areas in which we apply a deferential standard of review, past appellate decisions affirming on clear error review do not establish that the trademark at issue or similar trademarks are distinctive or descriptive per se, but only that the district court's classification was a plausible interpretation of the record. Stated another way, an appellate decision affirming that a trademark is or is not distinctive, after conclusion was reached in a trial, means only that the decision of the trial court, to whose judgment we significantly defer when a fact-intensive issue such as this has been tried, is

within the range where an appellate court should affirm absent clear error.

**[5]** Not surprisingly, appellate courts have upheld district court classifications of arguably distinctive trademarks as descriptive, and vice versa. *Compare Jockey Club*, 595 F.2d at 1167-68 (affirming district court classification that "Jockey Club" is not distinctive when applied to condominiums and a private membership club), *with Playtex Prods., Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 163-64 (2d Cir. 2004) (affirming district court classification that "Wet Ones" is suggestive as applied to individual pre-moistened towelettes). Our analysis of these past precedents reinforces the principle that appellate courts grant considerable deference to district court trademark classifications. Indeed, we are aware of only a handful of published opinions in the past forty years in which a district court's determination that a mark is suggestive rather than descriptive was held to be clearly erroneous on appeal. *See Forum*, 903 F.2d at 443-45 (reversing district court's classification of "Forum" as suggestive as applied to business training programs); *Security Ctr., Ltd. v. First Nat'l Sec. Ctrs.*, 750 F.2d 1295, 1298-1300 (5th Cir. 1985) (reversing district court's classification of "Security Center" as suggestive as applied to private storage facilities); *Vision Ctr. v. Opticks, Inc.*, 596 F.2d 111, 116-17 (5th Cir. 1979) (reversing district court's classification of "Vision Center" as suggestive as applied to "a clinic providing optical goods and services"). These few exceptions are entirely consistent with the maxim that absent legal error we owe great deference to a district court's factual decision on whether a mark is distinctive. And these cases mean more in establishing the boundaries between the fact-finding trial courts and the appellate courts than they do in establishing for all cases that a particular mark is distinctive or descriptive.

The district court determined that the Disputed Mark was suggestive in part because the PTO had granted federal trademark registration to the Arizona Mark, which like the Dis-

puted Mark consisted solely of a design around the word
"Vericheck." There can be no serious dispute with the princi-
ple that a federal trademark registration of a particular mark
supports the distinctiveness of that mark, because the PTO
should not otherwise give it protection. Registration alone
may be sufficient in an appropriate case to satisfy a determi-
nation of distinctiveness.⁵ *See* 15 U.S.C. § 1115(a) (stating
that PTO registration is "prima facie evidence of the validity
of the registered mark"); *Retail Servs., Inc. v. Freebies
Publ'g*, 364 F.3d 535, 542 (4th Cir. 2004) ("[T]he fact that a
mark is registered is strong evidence that the mark satisfies
the statutory requirements for the distinctiveness necessary
for trademark protection."). Moreover, we agree with the dis-
trict court that the PTO's registration of the Arizona Mark is
evidence of the Disputed Mark's distinctiveness, given the
strong similarity between the appearance and purposes of the
Arizona Mark and the Disputed Mark.⁶ Deference to the
PTO's classification decision is sensible because the PTO has
special expertise that we lack on this fact-intensive issue. *See
Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43
F.3d 922, 934 (4th Cir. 1995) ("Given [the difficulty] in deter-
mining whether a mark is descriptive or suggestive, courts
have often given due regard to the determination of the Patent
and Trademark Office, which necessarily decides whether a
mark is descriptive or suggestive in its decision whether to
register the mark.").

   **[6]** Although the statutory presumption of distinctiveness
applies only when the mark holder's own mark has been reg-
istered, courts may also defer to the PTO's registration of

---

   ⁵The PTO will also register a descriptive mark if it has secondary mean-
ing, but the PTO did not request a showing of secondary meaning from
the Arizona Company.

   ⁶The Arizona Mark consists of the word "VERICHECK" inside a geo-
metric shape, and the mark was registered for use with "check verification
services." The Vericheck mark consists of the word "VeriCheck" over a
checkmark, and the mark is registered in Georgia for "check verification
and check collection services."

highly similar marks. *See Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112, 119-20 (1st Cir. 2006) (holding that "the PTO's acceptance of these other marks [containing 'rica'] for registration supports the idea that 'rica' can be an inherently distinctive term"); 2 McCarthy on Trademarks § 11:69 ("[T]hird party mark registrations may in some cases support the argument that a designation is *not* descriptive. The fact that the [PTO] registered a number of marks containing the same designation without requiring proof of secondary meaning is some evidence that the PTO considers the designation not descriptive."). In particular, we agree with the Fourth Circuit that nearly identical marks used for similar products may be viewed in a common light when the PTO has found one of them to be suggestive. *See U.S. Search, LLC v. U.S. Search.com Inc.*, 300 F.3d 517, 524 (4th Cir. 2002) (stating that the principle that a mark is suggestive because PTO found a "nearly identical" mark to be suggestive "seems to make some intuitive sense" when the marks describe similar services).

**[7]** However, it should be noted that in some cases a series of prior registrations is evidence of the *descriptiveness* of a mark. As McCarthy explains:

> [T]hird-party registrations of composite marks including an allegedly descriptive term can be used to help prove the descriptive nature of that term. For example, introduction of many third-party registrations for electronic products of marks with a -TRONICS or -TRONIX suffix could be evidence that those third parties and the public consider such a suffix descriptive, such that there would be no likely confusion between DAKTRONICS and TEK-TRONIX.

2 McCarthy on Trademarks § 11:69. *See also Cutter Labs., Inc. v. Air Prods. & Chems., Inc.*, 189 U.S.P.Q. 108 (T.T.A.B. 1975); McCarthy § 11:69 ("Another test of descriptive-

LAHOTI v. VERICHECK, INC

suggestive connotations is to determine the extent to which other sellers have used the mark on similar merchandise. That is, if others are in fact using the term to describe their products, an inference of descriptiveness can be drawn."). Lahoti has made a version of this argument in this case, noting that, in addition to the use of the Arizona Mark by one business, a number of other businesses use a variation of the mark in conjunction with check verification services. It will be for the district judge to consider any such argument on remand.

[8] The PTO Appeal Board has cautioned that a third party registration is not "determinative" of distinctiveness if circumstances have materially changed since the third-party registration or if the registration is distinguishable because it combines one part of the disputed mark in that case with non-descriptive terms. *See In re Sun Microsystems, Inc.*, 59 U.S.P.Q.2d 1084, 1087-88 (TTAB 2001) (holding that third party registrations of marks containing "beans" are not evidence that "Agentbeans" was distinctive for software written in the Java computer programming language because other registrations "combine[d] 'beans' with what appear to be non-descriptive terms," and because "beans" had recently become a popular term for a form of Java code). Here, by contrast, the Arizona Mark and Disputed Mark are not just similar but are identical in text, and both were registered for use with "check verification services." More importantly, the parties did not present any evidence with regard to whether technological changes impact whether the term "Vericheck" should be considered to describe or rather only to suggest "check verification." We conclude that the federal registration of the Arizona Mark shows that the PTO thought "Vericheck" was distinctive and not descriptive of "check verification services."[7] The

---

[7]Lahoti argues that the federal registration of the Arizona Mark is instead evidence that the Disputed Mark was not distinctive in 2003, when Lahoti registered the Domain Name, because the Arizona company then had the exclusive right to use the mark and, according to Lahoti, only one of the two marks could be distinctive because they described similar ser-

district court's decision to rely on the third party PTO registration of the Arizona Mark for evidence that the Disputed Mark is distinctive was legally proper and not clearly erroneous.

**[9]** Nonetheless, the district court based its decision that the Disputed Mark was distinctive in part on reasoning that is contrary to federal trademark law. Context is critical to a distinctiveness analysis. Whether a mark is suggestive or descriptive "can be determined only by reference to the goods or services that it identifies." *Rodeo Collection, Ltd. v. W. Seventh*, 812 F.2d 1215, 1218 (9th Cir. 1987); *see also* 2 McCarthy on Trademarks 11:64 ("[T]he mark BRILLIANT may be 'descriptive' on diamonds, 'suggestive' on furniture polish, and 'arbitrary' on canned applesauce."). A related principle is that a mark "need not recite each feature of the relevant goods or services in detail to be descriptive." *In re Dial-A-Mattress Operating Corp.*, 240 F.3d 1341, 1346 (Fed. Cir. 2001).

**[10]** The district court erred to the extent it required that the Disputed Mark describe all of Vericheck's services to qualify as "descriptive." The district court reasoned that the Disputed Mark does not "immediately call to mind the broad array of electronic transaction processing services that Vericheck provides." However, a mark does not have to meet this requirement to be found descriptive. The inquiry is "whether, when the mark is seen on the goods or services, it immediately conveys information about their nature." *In re Patent & Trademark Servs. Inc*, 49 U.S.P.Q.2d 1537, 1539 (T.T.A.B. 1998).

---

vices. *See* 15 U.S.C. § 1125(d)(1)(A)(ii)(I) (stating that for liability under the ACPA a mark must be "distinctive at the time of registration of the domain name"). However, the federal registration of the Arizona mark actually makes it more likely that the Disputed Mark is distinctive, and "a third party's prior use of a trademark is not a defense in an infringement action." *Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 820 (9th Cir. 1996).

The district court further erred when it reasoned that the Disputed Mark could have described services that are unrelated to those offered by Vericheck, such as baggage checking and pre-employment background verification. The mark must be evaluated as if it were "seen on the goods or services," which means the mark must be examined in the industry context rather than in the abstract. *See id.*

**[11]** The district court also misapplied the law by asserting that "Lahoti *improperly* breaks down the mark into two component parts, 'veri' and 'check,' in order to argue that consumers will immediately presume that Vericheck provides 'check verification' services." (Emphasis added.) Rather, courts may analyze all components of the mark in determining whether those parts, taken together, merely describe the goods or services offered. *In re Oppedahl & Larson LLP*, 373 F.3d 1171, 1174 (Fed. Cir. 2004) ("In considering a mark as a whole, the [Trademark Trial and Appeal] Board may weigh the individual components of the mark to determine the overall impression or the descriptiveness of the mark and its various components.").

In analyzing the compound "VeriCheck" mark, the district court may therefore have broken the mark into "veri-" and "check," to "separately view the component parts as a preliminary step on the way to an ultimate determination of probable customer reaction to the composite as a whole." 2 McCarthy on Trademarks § 11:27; *see also Bernard v. Commerce Drug Co.*, 964 F.2d 1338, 1341-42 (2d Cir. 1992) (holding that "Arthriticare" is descriptive of an arthritis medication by analyzing "arthriti" and "care" separately); *Telemed Corp. v. Tel-Med, Inc.*, 588 F.2d 213, 217-19 (7th Cir. 1978) (holding that "Telemed" is a descriptive mark by analyzing meaning of "tele" and "med"). Even though the district court ultimately analyzed the Disputed Mark's component parts individually, we cannot be sure that the district court, having earlier misstated the law, properly accounted for those individual components.

**[12]** We conclude that the district court's decision that the "VeriCheck" mark was a distinctive, legally protectable mark under the ACPA and federal trademark law was based in part on reasoning contrary to federal trademark law and based in part on reasoning that could support the district court's conclusion. Accordingly, because the district court did not rely exclusively on the proper legal standard, we vacate the judgment to the extent it determined the Disputed Mark was distinctive. We remand to permit the district court to determine whether the Mark is distinctive or descriptive taking into account the principles that we have outlined here. *See Pintado-Isiordia*, 448 F.3d at 1158.[8]

## B

Lahoti contests the district court's determination on summary judgment that he acted with "a bad faith intent to profit" from the use of the Disputed Mark.[9] 15 U.S.C. § 1125(d)(1)(A)(i). We review the district court's grant of summary judgment *de novo. JG v. Douglas Cty. School Dist.*, 552 F.3d 786, 802 (9th Cir. 2008).

**[13]** "A finding of 'bad faith' is an essential prerequisite to finding an ACPA violation," though it is not required for general trademark liability. *Interstellar Starship Servs., Ltd. v.*

---

[8]Because we vacate the district court's finding of distinctiveness, we accordingly need not reach the issues of confusion, attorneys' fees under federal law, and attorneys' fees under the WCPA.

[9]The district court properly granted summary judgment on the issue of Lahoti's bad faith even though it later held a trial on the issue of trademark distinctiveness. Although Vericheck must prove all the requisite elements to recover under the ACPA, including distinctiveness, the district court may render partial summary judgment on those facts, including bad faith, not genuinely at issue. Fed. R. Civ. P. 56(d) & advisory committee's note ("The partial summary judgment is merely a pretrial adjudication that certain issues shall be deemed established for the trial of the case . . . and likewise serves the purpose of speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact.").

*Epix, Inc.*, 304 F.3d 936, 946 (9th Cir. 2002). Evidence of bad faith may arise well after registration of the domain name. *See Storey v. Cello Holdings, LLC*, 347 F.3d 370, 385 (2d Cir. 2003) ("Congress intended the cybersquatting statute to make rights to a domain-name registration contingent on ongoing conduct rather than to make them fixed at the time of registration.").

Congress has enumerated nine nonexclusive factors for courts to consider in determining whether bad faith exists. *See* 15 U.S.C. § 1125(d)(1)(B)(i). "We need not, however, march through the nine factors seriatim because the ACPA itself notes that use of the listed criteria is permissive." *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 269 (4th Cir. 2001). "[I]nstead, the most important grounds for finding bad faith are the unique circumstances of the case . . . ." *Interstellar Starship*, 304 F.3d at 946 (quotation omitted). Congress has said that in evaluating bad faith, courts may consider a person's prior cybersquatting activities. *See* 15 U.S.C. § 1125(d)(1)(B)(i)(VIII) (providing that courts may consider "the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive"). Also, Congress has provided a safe harbor for ACPA defendants who "believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." *Id.* § 1125(d)(1)(B)(ii).

**[14]** Viewing the evidence in the light most favorable to Lahoti, the record still supports the district court's summary judgment determination that Lahoti was motivated by a bad faith intent to profit from his use of the Disputed Mark. Lahoti never used the Domain Name in connection with a bona fide offering of goods and services. Instead, Lahoti earned income when customers clicked on links when visiting the Domain Name website, some of which directed them to Vericheck's competitors. Lahoti then asked for as much as $72,500 to sell the Domain Name to Vericheck even though Lahoti had no

interests associated with the "Vericheck" name. Finally, it is undisputed that Lahoti is a repeat cybersquatter who has registered hundreds of domain names resembling distinctive or famous trademarks and has been admonished by judicial bodies for doing so. Lahoti's response is a vague objection that the district court did not consider the facts in the light most favorable to him. But even in this favorable light, Lahoti's behavior shows "the sort of misconduct that Congress sought to discourage" by enacting the ACPA. *Virtual Works*, 238 F.3d at 270.

**[15]** Lahoti argues that he is entitled to protection under the bad faith safe harbor because he reasonably believed his use of the Domain Name was lawful. *See* 15 U.S.C. § 1125(d)(1)(B)(ii). However, courts should "make use of this 'reasonable belief' defense very sparingly and only in the most unusual cases." *Audi AG v. D'Amato*, 469 F.3d 534, 549 (6th Cir. 2006) (quoting 4 McCarthy on Trademarks § 25:78)). Otherwise, the defense would "undermine the rest of the statute" because "[a]ll but the most blatant cybersquatters will be able to put forth at least some lawful motives for their behavior." *Virtual Works*, 238 F.3d at 270. We agree with the Fourth Circuit, which, in affirming a summary judgment determination of bad faith, has held that "[a] defendant who acts even partially in bad faith in registering a domain name is not, as a matter of law, entitled to benefit from the [ACPA's] safe harbor provision." *Id*. As we see the record, there is no genuine appellate issue on Lahoti's bad faith. He has made his cybersquatter bed and now cannot persuasively challenge the district court's conclusion that he must lie in it. A different case might be presented if Lahoti had a genuine business marketing service for which the Vericheck name was an aid, but there was no credible evidence of that here, nothing but his self-serving affidavit.[10]

---

[10]Lahoti claimed that in the late 1990s he decided he "might start a business to verify and secure online payments, checks, and credit." The district court rejected this testimony and found that Lahoti "has never used the Domain Name in connection with the bona fide offering of goods or services." We see no clear error in the district court's factual determination.

[16] A reasonable person in Lahoti's position—that is, a reasonable person who had previously been declared a cyber-squatter in a judicial proceeding—should have known that his actions might be unlawful. Lahoti has previously advanced, unsuccessfully, the same trademark defenses he argues here, including the claim that the mark at issue was only descriptive and that he is entitled to the safe harbor. Lahoti's failed defenses in these other cases make it unlikely that he legitimately believed that his use of the Domain Name was wholly lawful in this case. *See Coca-Cola Co. v. Purdy,* 382 F.3d 774, 788 (8th Cir. 2004) (rejecting the defendant's safe harbor defense because the defendant had previously been enjoined in a prior Internet trademark case while advancing a similar defense). Although Lahoti may have believed that Veri-check's Disputed Mark was descriptive, his use of the Domain Name to link to Vericheck's competitors and his willingness to sell the Domain Name only for an exorbitant profit are quintessential cybersquatting practices. Lahoti acted at least "partially in bad faith" in gambling that the district court would agree with his interpretation of trademark law, and he knew or should have known that he would risk cyber-squatting liability if his gamble failed. *Virtual Works*, 238 F.3d at 270. Lahoti is not entitled to the safe harbor. We affirm the district court's grant of summary judgment that Lahoti acted in bad faith.

## IV

Whether a mark is suggestive or descriptive is a fact-intensive question that poses a difficult decision in many close cases. It is a foundational point that we owe substantial deference to the trier of fact on its decision, made after a trial, as to whether a mark is merely descriptive, and not worth trademark protection, or is instead suggestive, and able to gain the benefit of trademark law. Yet where it is unclear whether the district court properly applied the law in determining suggestiveness or descriptiveness, we may vacate the judgment and remand with instructions to apply the correct

legal standard. While the district court perhaps could have relied exclusively on the registration of the Arizona Mark to determine suggestiveness, it did not do so. Instead, the district court improperly required that the Mark describe all of Vericheck's services, examined the Mark in the abstract, and concluded that it could not analyze the Mark's component parts. Accordingly, we vacate the judgment and remand with instructions for further proceedings not inconsistent with this opinion.

In light of this conclusion, we need not assess the district court's conclusions that Vericheck established all other elements of its trademark infringement, ACPA, and WCPA claims, and that Vericheck was entitled to attorneys' fees under the Lanham Act and the WCPA. However, we affirm the district court's conclusion reached on summary judgment that Lahoti acted in bad faith.

Pursuant to Federal Rule of Appellate Procedure 39(a) and Ninth Circuit General Order 4.5(e), each party shall bear its own costs.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**