1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF WASHINGTON
                            AT SEATTLE

9

10   DAVID LAHOTI,                          CASE NO. C06-1132JLR

11              Plaintiff / Counterclaim    AMENDED
                Defendant,                  FINDINGS OF FACT AND
12                                          CONCLUSIONS OF LAW

                v.
13
     VERICHECK, INC.,
14
                Defendant /
15              Counterclaim Plaintiff.

16                        I.    INTRODUCTION

17        This matter returns to the court on remand from the United States Court of

18   Appeals for the Ninth Circuit following its decision in *Lahoti v. VeriCheck, Inc.,* 586

19   F.3d 1190 (9th Cir. 2009).  Prior to the appeal, the court conducted a bench trial in this

20   matter that began on November 6, 2007.  At trial, Plaintiff/Counterclaim Defendant

21   David Lahoti was represented by John Du Wors and Derek Linke of Newman &

22   Newman, Attorneys at Law, LLP.  Defendant/Counterclaim Plaintiff Vericheck, Inc.

ORDER- 1

1   ("Vericheck") was represented by Shannon Jost of Stokes Lawrence, P.S.  Upon the

2   conclusion of the trial, the court took the case under advisement and subsequently made

3   its original Findings of Fact and Conclusions of Law (Dkt. # 81).

4        Following entry of judgment, Mr. Lahoti appealed to the Ninth Circuit.  On

5   November 16, 2009, the Ninth Circuit issued its opinion in *Lahoti*, wherein the Ninth

6   Circuit affirmed in part and vacated in part this court's decision and remanded the case to

7   this court for further proceedings.  The court has now considered the Ninth Circuit's

8   opinion in *Lahoti* and reviewed the post-appeal briefing submitted by the parties.  The

9   court has also considered the evidence and exhibits admitted at trial, the findings and

10  conclusions reached in the court's order on summary judgment ("SJ Order") (Dkt. # 52),

11  and counsels' arguments.

12       Therefore, being fully advised, the court makes its Amended Findings of Fact and

13  Conclusions of Law.

14                        **II.    FINDINGS OF FACT**

15                              **Background**

16  1.    Vericheck, a Georgia corporation, is a national provider of electronic

17  payment transaction processing services, and has been using the VERICHECK mark (or,

18  "the mark") in connection with its business since at least 1992.  In 2003, Vericheck

19  attempted to register the mark with the United States Patent and Trademark Office

20  ("PTO") but was unable to do so because an Arizona company successfully registered

21  VERICHECK as a word mark in 1975.  (2d Hannah Decl. (Dkt. # 26) ¶ 8, Exs. 7, 8.)

22

ORDER- 2

1          2.      According to Vericheck's Chief Executive Officer ("CEO") Jerry Hannah,

2    who purchased the company in 1995, Vericheck has maintained a World Wide Web

3    presence at <vericheck.net> since 1999 and began offering its services online about a

4    year later.  (*Id.* ¶ 2.)  The company also registered the domain names <vericheck.org>,

5    <vericheck.cc>, <vericheck.us>, and <vericheck.biz>, many of which redirect visitors to

6    <vericheck.net>.  Vericheck now conducts its business primarily over the Internet and

7    through its resellers and independent sales offices ("ISOs"), who rely on the Internet,

8    including Vericheck's websites, as a primary mode of communication with Vericheck.

9    On August 31, 2001, the company successfully registered a service mark with the State of

10   Georgia, described as "a depiction of a check mark over the word 'vericheck.'"  (2d Jost

11   Decl. (Dkt. # 28) ¶ 3, Ex. B.)

12         3.      Mr. Lahoti is an adjudicated cybersquatter who has registered thousands of

13   domain names and prospectively registers domain names of services he "might offer"

14   based on his "ideas for new ventures."  (Lahoti Decl. (Dkt. # 31) ¶¶ 7-8; Jost Decl. (Dkt.

15   # 16), Ex. B (*E-Stamp Corp. v. Lahoti*, Case No. 2:99-CV-9287-GAF-MAN (C.D. Cal.

16   Jun. 12, 2000)); Supp. Jost Decl. (Dkt. # 23), Ex. K; SJ Order at 12 n.9.)  After having

17   tracked <vericheck.com> ("Domain Name") for five years, Mr. Lahoti, a self-described

18   "Internet entrepreneur," registered the Domain Name in March 2003.  (Lahoti Decl. ¶¶ 3,

19   11.)  The Domain Name incorporates the VERICHECK mark.  Mr. Lahoti uses

20   <vericheck.com> in connection with a directory website providing links to companies

21   that compete with Vericheck.  (*See* Ex. A-10.)

22

4.      Prior to Mr. Lahoti purchasing the Domain Name, it was owned by a Canadian company.  For several years, Mr. Hannah and other Vericheck representatives attempted to secure rights to <vericheck.com> from the Canadian company.  Once Mr. Lahoti purchased the Domain Name, he expressed a willingness to sell the Domain Name to Vericheck at prices that ranged from $48,000 to $100,000.  (SJ Order at 3-4.)

5.      In June 2006, Vericheck filed a complaint with the National Arbitration Forum ("NAF") pursuant to the Uniform Domain-Name Dispute-Resolution Policy seeking an order transferring <vericheck.com> to Vericheck.  Mr. Lahoti responded and objected.  In August 2006, the arbitrator issued a decision ordering transfer of the Domain Name to Vericheck.

6.      Mr. Lahoti filed the instant action for declaratory relief challenging NAF's decision pursuant to 15 U.S.C. § 1114(2)(D)(v), which allows a registrant whose domain name has been suspended, disabled, or transferred to file a civil action to establish that his or her use of the domain name is lawful.  Mr. Lahoti seeks a declaratory judgment that his use of the Domain Name does not contravene the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), or any other provision of the Lanham Act, 15 U.S.C. § 1051 *et seq*.  In its answer, Vericheck pleads the following counterclaims: violation of the ACPA; Lanham Act false designation of origin, 15 U.S.C. § 1125(a); common law trademark infringement and trade name infringement; common law unfair competition and misappropriation; and a violation of Washington's Consumer Protection Act ("CPA"), RCW § 19.86.020.  Vericheck seeks transfer of the Domain Name, statutory damages, and attorneys' fees.

ORDER- 4

7.      The parties filed cross-motions for summary judgment.  On August 30, 2007, the court denied Mr. Lahoti's motion and granted in part and denied in part Vericheck's motion.  The court found the following: Mr. Lahoti registered and used <vericheck.com> in bad faith (SJ Order at 12-14); Mr. Lahoti is not entitled to take refuge in the "safe harbor" provision of Lanham Act § 43(d), 15 U.S.C. § 1125(d)(1)(B)(ii) (SJ Order at 14); the Domain Name and the VERICHECK mark are identical or confusingly similar (*id*. at 6, 17); Vericheck's use of the mark predates Mr. Lahoti's registration of the Domain Name (*id*. at 7 n.5); Mr. Lahoti's use of the Domain Name for a directory website and his offers to sell the Domain Name constitute "commercial use" (*id*. at 15); and both parties use the Internet as a marketing channel (*id*. at 17).

8.      With respect to liability, the court found that there were issues of fact with regards to: (1) the distinctiveness of the VERICHECK mark; and (2) the likelihood of consumer confusion caused by Mr. Lahoti's use of the mark.  The first issue affects all five of Vericheck's counterclaims.  The second issue affects all claims except for the ACPA counterclaim.

9.      At the bench trial, Vericheck called two witnesses to testify: Vericheck CEO Mr. Hannah and Mr. Lahoti.  Mr. Lahoti called a single witness, Tom Nort, to testify telephonically in rebuttal to Mr. Hannah's deposition testimony of November 5, 2007.  Mr. Nort sold the VERICHECK mark and business to Mr. Hannah.

10.     Because the court had already determined that Mr. Lahoti used the VERICHECK mark in bad faith, on the second day of the trial the parties agreed that the court could determine statutory damages and attorneys' fees on the existing record without need for trial testimony.

11.     On December 3, 2007, the court issued its Findings of Fact and Conclusions of Law (Dkt. # 81).  The court determined that the VERICHECK mark is distinctive and strong; that Mr. Lahoti, by his registration, use, and attempted sale of the <vericheck.com> domain name, had violated Lanham Act § 43(a) and (d), 15 U.S.C. § 1052 *et seq.*; and that Mr. Lahoti's acts constituted common law trademark infringement and trade name infringement, common law unfair competition and misappropriation, and a violation of the CPA.  The court awarded Vericheck $100,000 in statutory damages under 15 U.S.C. § 1117(d).  In subsequent orders, the court awarded Vericheck its attorneys' fees and costs.

12.     Mr. Lahoti appealed to the Ninth Circuit.  On November 16, 2009, the Ninth Circuit issued an opinion affirming in part and vacating in part, and remanded the matter to this court for consideration in light of the principles articulated in *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190 (9th Cir. 2009).

**Vericheck's Business, Its Services, and Consumer Confusion**

13.     In 1992, Mr. Nort started Vericheck in Georgia.  Vericheck was a verification company for check processing that appeared to employ a unique system for tracking account information.

14.     Mr. Hannah met Tom Nort in 1992 or 1993.  In 1995, Mr. Hannah purchased Vericheck from Mr. Nort.  The assets included in the sale were the company's computer programs, computers, processing equipment, and the name Vericheck, Inc.  Mr. Hannah continued to do business as Vericheck and has always used the name Vericheck to brand the company's services.  Mr. Nort thereafter changed the name of his business so that he could offer services that he had not sold to Mr. Hannah as part of the sale of the Vericheck business.  (*See* Ex. A-21.)

15.     Mr. Nort was called to testify telephonically as a rebuttal witness to challenge Mr. Hannah's deposition testimony that Vericheck had been doing business under the Vericheck name since 1991 or 1992.  Mr. Nort instead corroborated Mr. Hannah's testimony, testifying that Vericheck began offering services in 1991 or 1992 and, when pressed, said that he would have to settle on "around 1992."  Mr. Nort further testified that salesmen used the VERICHECK mark to solicit business in Atlanta, Georgia and the surrounding area, as well as in Gainesville, Georgia.

16.     Mr. Hannah registered Vericheck, Inc. with the State of Georgia on September 7, 1999.  (Exs. 4, 5.)  He testified credibly that his delay in registering the company was due to the death of one parent and the debilitating illness of his other parent around the same time that he began operating Vericheck.  Vericheck owns a State of Georgia trademark registration, No. S-19547, for the mark VERICHECK & Design, issued August 31, 2001.  (Ex. A-3.)

17.     Vericheck provides a broad array of financial and merchant solutions, including check and other financial verification services; check guarantee services; check collection and prosecution of delinquent payments; verification of account information, balance, and positive or bad/fraudulent account transaction history; monitoring and reporting of check transaction history; payment processing services (credit card, debit card, echecks, electronic benefit transfer ("EBT"), wireless payments, stored value or purchasing cards, and personal or merchant check); and related transactional and technical support services.  (*See, e.g.*, Exs. A-4, A-9, 4, 5, 15.)  The vast majority of Vericheck's business involves automated check handling ("ACH"), which includes prearranged payment debits ("PPD"); commercial cash debits ("CCD"); accounts receivable conversion ("ARC"); telephone transactions; back office conversion ("BOC"); point-of-purchase transactions ("POP"); returned check collection ("RCK"); and consolidated returns ("RCC").  Of these ACH transactions, ARC, BOC, POP, RCK, and RCC depend upon the existence of a physical check.

18.     There are approximately 1,500 merchants conducting electronic transactions through Vericheck.  Its customers include large private corporations such as the home security company ADT, as well as county and city governments, law firms, and professional organizations.  Mr. Hannah testified that Vericheck's sales volume in 1995 was "minuscule," but the company now is involved with approximately $300 million in transactions per year, which translates to approximately 300,000 transactions.  According to Mr. Hannah, in 2001-2002, Vericheck's business "really took off" and the "trajectory

1  was straight up"; this increase in business was related to Vericheck's partnership with

2  USA ePay.  Presently, Vericheck grosses approximately $60,000 per month.

3        19.    Vericheck promotes its name and services through trade shows, banking

4  shows, and electronic transactions exhibitions in Las Vegas and San Jose; merchant's

5  forums in Eureka, California, southern Tampa, Florida, and Atlanta, Georgia; and vendor

6  groups sponsored by regional and national banks.  Mr. Hannah personally attends two to

7  three trade shows per year, distributing material and business cards, all of which

8  prominently display the VERICHECK mark.  It costs approximately $5,000 to register

9  for a trade show and additional expenses are incurred for setting up a booth.  Vericheck

10  also offers incentives to promote its services, for example, waived application fees for

11  vendors, and asks that its ISOs and resellers participate in promoting these incentives.

12        20.    Mr. Hannah testified that approximately 90% of Vericheck's business is

13  conducted through the Internet.  This includes Vericheck's secure network and merchant

14  transactions.  Vericheck, its resellers, and ISOs also direct merchants to the website

15  posted at Vericheck's <vericheck.net> to fill out applications, service agreements, and for

16  further information.  Vericheck, its resellers, and ISOs use VERICHECK as a trademark

17  regularly.  (*See, e.g.*, Exs. A-4 (using the mark on the website posted at <vericheck.net>),

18  A-9 (using the mark on the website posted at <USAePay.com>).)

19        21.    Mr. Hannah testified that he personally receives two or three calls per day

20  from Vericheck resellers who say that customers are confused when they visit the website

21  posted at <vericheck.com> and cannot find the Vericheck merchant application.

22  According to Mr. Hannah, these resellers ask what the company is doing to increase

ORDER- 9

1  Vericheck's presence on the Internet and to eliminate the confusion when merchants

2  attempt to locate the Vericheck application online and visit Mr. Lahoti's website posted

3  at <vericheck.com> instead of the website posted at Vericheck's <vericheck.net>.

**The VERICHECK Mark and Distinctiveness**

4

5      22.    An Arizona company successfully registered VERICHECK as a word mark

6  in 1975.  (Exs. 7, 8.)  These registrations were not renewed by the trademark owner and

7  have expired.  (Exs. 9-10.)  There is no evidence in the record that the Arizona company

8  ever used the VERICHECK mark.

9      23.    Mr. Hannah testified credibly that the Arizona company has never and does

10 not presently offer services similar to those of Vericheck.  According to Mr. Hannah, the

11 Arizona company is primarily a civil collections firm.  Mr. Hannah has spoken with the

12 Arizona company's principal and Vericheck presently has a referral agreement with that

13 company: once checks are processed through the RCK process, Vericheck will refer the

14 "hard collections" to the Arizona company.  Mr. Hannah believes that the Arizona

15 company does business under a name other than "Vericheck."

16     24.    In July 2007, Vericheck applied for registration of the VERICHECK mark.

17 (Ex. 30.)  The PTO recently completed its initial examination of Vericheck's application

18 for registration of the VERICHECK mark, and has approved Vericheck's application for

19 publication for opposition.  (Ex. A-22.)  Mr. Lahoti has opposed Vericheck's application.

20     25.    At trial, Mr. Lahoti testified inconsistently and evasively about his research

21 into the <vericheck.com> domain name.  In his answers to interrogatories, Mr. Lahoti

22 stated that he began researching domain names with the "VERI-" prefix in 1998,

ORDER- 10

1   discovering that <vericheck.com> was, at that time, registered to a Canadian company;

2   searched the PTO's online database, finding that an Arizona company had registered the

3   VERICHECK mark; and then conducted an Internet search, determining that "the

4   Arizona entity was no longer using the alleged mark VERICHECK," and that "a number

5   of other third parties were using terms identical or similar to VERICHECK in connection

6   with their goods or services." (Ex. A-23, at 9.) Mr. Lahoti testified: (1) he could not

7   verify that his answers to interrogatories were accurate; (2) he may not have verified or

8   reviewed the answers to interrogatories before they were served on opposing counsel; (3)

9   he was unaware of any duty to ensure that his answers were accurate; and (4) his attorney

10  told him that any inaccuracies could be sorted out at trial.

11          26.     Mr. Lahoti testified that he did an Internet search for "Vericheck" and that

12  the Arizona company did not appear in any of the results. He further stated that he did

13  not take specific notice of Vericheck's presence on the Internet because he was

14  "overwhelmed" by the number of companies doing business on the Internet as

15  "Vericheck."

16          27.     Mr. Lahoti has earned $724 in revenue from owning <vericheck.com>. He

17  received this revenue from Oversee.net, which pays Mr. Lahoti based upon the number of

18  times a visitor to <vericheck.com> clicks through links on the page. He testified that he

19  did not know how much he earned per click, and could not recall the number of times that

20  visitors clicked through the links. He said that he did not scrutinize the statistics provided

21  by Oversee.net closely enough to hazard a guess as to how his revenue was earned.

22

28.     Vericheck's use of the VERICHECK mark predates nearly all of the alleged uses cited by Mr. Lahoti.  Several of the purported third-party uses either are unsupported, irrelevant, or support the distinctiveness of the VERICHECK mark as used by Vericheck to describe its services.

29.     Most of the alleged uses upon which Mr. Lahoti relies are in unrelated services.  For example, "VeriCheck Information Services" offers background investigation services (Exs. 20, 21); "Vericheck, Inc." offers pre-employment background services (Exs. 22, 23); VeriCheck provides "Professional Pre-employment Verification Service" (Ex. 24); and "VERI-CHECK" offers an ultraviolet counterfeit money detector (Moeller Decl. (Dkt. # 32) Ex. 25).

30.     Mr. Lahoti argued in his trial brief that another company, GLA, Inc., had an earlier use of a "vericheck" designation.  However there is no evidence of record showing any use whatsoever by GLA, Inc. of the mark, and the slim documentation provided by Mr. Lahoti (Ex. 17) indicates that GLA registered the trade name VERICHECK in Hawaii in 1997, at least five years after Vericheck adopted the mark.

31.     Mr. Lahoti also cites VeriChek, Inc., a Texas company (Ex. 13); however, the earliest alleged use of the mark by that company is 1995, at least three years after Defendant adopted the VERICHECK mark.

32.     Mr. Lahoti references three third-party uses that allegedly commenced before Vericheck first adopted the VERICHECK mark in 1992: Credit Associates of Maui; Veri-Cheque of Canada (Ex. 18); and Vericheck Services, Inc. of Arizona (Exs. 7-10).  There is no evidence indicating whether or the extent to which Credit Associates of

1    Maui or Veri-Cheque of Canada actually used and promoted any mark in connection with

2    their services.  The sole evidence presented by Mr. Lahoti concerning Veri-Cheque of

3    Canada's alleged use of a mark are a page printed from an Internet archive from 1998, six

4    years after Defendant adopted its VERICHECK mark, and a page printed from Veri-

5    Cheque's current website in June 2007, fifteen years after Defendant adopted its

6    VERICHECK mark.  Moreover, Veri-Cheque is a Canadian company, and aside from a

7    statement on the website that it operates in "North America" there is no evidence of

8    actual goods or services provided in the United States.

9        33.    The court finds that the evidence introduced at trial about the Arizona

10   company supports Vericheck's contention that the mark is distinctive.  The Arizona

11   company does not use the mark in connection with services that compete with Vericheck.

12   Mr. Lahoti's own investigation showed that the company did not use the VERICHECK

13   mark, at least on the Internet, and he has not produced evidence to contradict his own

14   investigation.  Furthermore, that the PTO allowed the Arizona company to register the

15   now expired VERICHECK mark without requiring proof of secondary meaning affords a

16   rebuttable presumption that the mark is inherently distinctive for "check verification

17   services."  (Ex. 7 (capitalization removed)); *see Abercrombie & Fitch Co. v. Hunting*

18   *World, Inc.*, 537 F.2d 4, 11 (2d Cir. 1976).

19       34.    The VERICHECK mark has no common English meaning, and appears in

20   no dictionary.  The VERICHECK mark does not immediately convey information about

21   the nature of Vericheck's goods and services, either in whole or in part.  If the term

22   VERICHECK is understood by the average consumer to suggest Vericheck's services,

ORDER- 13

1 either in whole or in part, such understanding requires imagination or a mental leap by

2 the consumer, in order to become apparent.  The court therefore finds the VERICHECK

3 mark to be inherently distinctive.

4       35.     Vericheck has also presented substantial proof of the VERICHECK mark's

5 strength in the marketplace in the form of Vericheck's extensive and longstanding use

6 and promotion of the mark as well as the company's expanding territory, client list, and

7 sales figures.

8 ### III.    CONCLUSIONS OF LAW

9       1.     Vericheck has presented facts that establish the distinctiveness of the

10 VERICHECK mark and the likelihood of consumer confusion caused by Mr. Lahoti's

11 use of the mark.  Given that the mark is strong and protectable, Vericheck is entitled to

12 judgment on its five counterclaims: (1) violation of the ACPA; (2) Lanham Act false

13 designation of origin; (3) common law trademark infringement and trade name

14 infringement; (4) common law unfair competition and misappropriation; and (5) violation

15 of the Washington CPA.  Mr. Lahoti's claims are dismissed.

16 ### Counterclaim I: Anti-Cybersquatting Consumer Protection Act

17       2.     The ACPA, which Congress incorporated into the Lanham Act in 1999,

18 sets forth the elements of a cybersquatting claim.  To prevail, Vericheck must prove that

19 it holds a distinct mark, that Mr. Lahoti had a "bad faith intent to profit" from the mark,

20 and that Mr. Lahoti "register[ed], traffic[ked] in, or use[d] a domain name" that is

21 identical to, or confusingly similar to that mark.  *See* 15 U.S.C. § 1125(d)(1)(A)(i)-(ii).

22 The ACPA protects both federally-registered marks as well as unregistered marks.

1    *DaimlerChrysler v. The Net Inc.*, 388 F.3d 201, 205 (6th Cir. 2004) (citing *Two Pesos*

2    *Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)); *see also* 4 J. THOMAS MCCARTHY,

3    MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 25:78 (4th ed. 2007)

4    (hereinafter "MCCARTHY").

5           3.      The Court already concluded that Mr. Lahoti registered and used the

6    domain name <vericheck.com> in bad faith, and that he made commercial use of the

7    mark and Domain Name.  (SJ Order at 11-13, 15-16); *see also Lahoti*, 586 F.3d at 1203-

8    04 ("We affirm the district court's grant of summary judgment that Lahoti acted in bad

9    faith.").  Likewise, "[t]here is no dispute that vericheck.com and the VERICHECK mark

10   are identical or confusingly similar."  (SJ Order at 6.)  Thus the remaining issue for trial

11   was the distinctiveness of the VERICHECK mark.  *See also Lahoti*, 586 F.3d at 1197

12   ("Vericheck cannot prevail on its trademark claims unless its Disputed Mark is

13   distinctive.").

14          4.      There are five categories of trademarks: (1) generic; (2) descriptive; (3)

15   suggestive; (4) arbitrary; and (5) fanciful.  *Yellow Cab Co. of Sacramento v. Yellow Cab*

16   *of Elk Grove, Inc.*, 419 F.3d 925, 927 (9th Cir. 2005).  Word marks that are "'arbitrary'

17   ('Camel' cigarettes), 'fanciful' ('Kodak' film), or 'suggestive' ('Tide' laundry

18   detergent)" are inherently distinctive.  *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529

19   U.S. 205, 210-11 (2000); *Lahoti*, 586 F.3d at 1197.  These three categories are entitled to

20   trademark protection because they "serve[ ] to identify a particular source of a product . .

21   . ."  *Two Pesos*, 505 U.S. at 768.  The Ninth Circuit has stated "that the 'primary

22   criterion' for distinguishing between a suggestive and a descriptive mark 'is the

1    imaginativeness involved in the suggestion, that is, how immediate and direct is the

2    thought process from the mark to the particular product.'" *Lahoti*, 586 F.3d at 1198

3    (quoting *Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59

4    F.3d 902, 911 (9th Cir. 1995)).  "A mark is suggestive 'if imagination or a mental leap is

5    required in order to reach a conclusion as to the nature of the product being referenced.'"

6    *Id.* (quoting *Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc.*, 198 F.3d 1143,

7    1147 n.3 (9th Cir. 1999)).  By contrast, "a mark is descriptive if it 'define[s] a particular

8    characteristic of the product in a way that does not require any exercise of the

9    imagination."  *Id.* (quoting *Yellow Cab*, 419 F.3d at 927).  A descriptive mark receives

10   trademark protection only when it establishes "secondary meaning" in the marketplace.

11   *Yellow Cab*, 419 F.3d at 927.  Generic marks receive no protection because they simply

12   identify the product, rather than the source of the product.  *Id.* (internal citation omitted).

13   "Placement on the spectrum of distinctiveness does not end the enquiry as to the strength

14   of a mark: it is only the first step.  The second step is to determine the strength of this

15   mark in the marketplace.  That is, to ascertain its degree of recognition in the minds of

16   the relevant customer class."  2 MCCARTHY §11.2.

17        5.    Vericheck contends that the VERICHECK mark is inherently distinctive

18   and is protectable as a trademark even without evidence of secondary meaning.  Also, the

19   VERICHECK mark has acquired distinctiveness in the minds of consumers as a result of

20   Vericheck's long use, advertising and promotion, and extensive sales of Vericheck's

21   financial transaction processing services, all in connection with the VERICHECK mark.

22   Mr. Lahoti contends that the VERICHECK mark is generic or descriptive, and thus either

1  unprotectable under any circumstance, or protectable only on a showing of secondary

2  meaning.

3       6.     The distinctiveness of a mark must be assessed not in the abstract, but in

4  relation to the applicable goods or services, the context in which the mark is used and

5  encountered in the marketplace, and the significance the mark in that context is likely to

6  have to the average consumer.  *Lahoti*, 586 F.3d at 1201.  As the Ninth Circuit teaches,

7  "[c]ontext is critical to a distinctiveness analysis."  *Id*.  A mark need not describe the full

8  scope and extent of the applicable goods and service in order to be deemed descriptive.

9  Instead, "[t]he inquiry is 'whether, when the mark is seen on the goods or services, it

10  immediately conveys information about their nature.'"  *Id*. (quoting *In re Patent &*

11  *Trademark Servs. Inc.*, 49 U.S.P.Q.2d 1537, 1539 (T.T.A.B. 1998)).

12       7.     Furthermore, in assessing a mark's strength, the mark must be analyzed as a

13  whole.  *Id*.  This does not, however, mean that the court may not break down the mark

14  into component parts as a preliminary step.  *Id*.  "Rather, courts may analyze all

15  components of the mark in determining whether those parts, taken together, merely

16  describe the goods or services offered."  *Id*. (citing *In re Oppedahl & Larson LLP*, 373

17  F.3d 1171, 1174 (Fed. Cir. 2004)).  Combinations of words or word parts in a mark,

18  which might themselves be descriptive if taken separately, are not necessarily descriptive

19  if used as a mark.  *See, e.g., Equine Techs., Inc. v. Equitech., Inc.*, 68 F.3d 542, 545 (1st

20  Cir. 1995) (holding that "EQUINE TECHNOLOGIES" in its entirety is not descriptive of

21  hoof pads for horses, notwithstanding that "equine" describes horses).

22

8.      Taken in its entirety, the VERICHECK mark is suggestive.  The term VERICHECK has no common English meaning, and does not appear in any dictionaries. When viewed in the context of Vericheck's services, whether in whole or in part, including Vericheck's check verification services, the VERICHECK mark does not immediately convey information about the nature of Vericheck's services.  Vericheck's long use of the VERICHECK mark as a trademark, and not as a descriptor of its goods and services, also supports the court's finding that the mark is protectable.

9.      In reaching this conclusion, the court has considered the component parts of the VERICHECK mark "as a preliminary step on the way to an ultimate determination of the probable consumer reaction to the composite as a whole." *Lahoti*, 586 F.3d at 1201 (quoting 2 MCCARTHY § 11:27).  The VERICHECK mark breaks down into two component parts:  "veri" and "check."  "Veri" has no independent meaning, and "check" could refer to a noun, a verb, or an interjection, and has a myriad of meanings.  *See Dictionary.com, Dictionary.com Unabridged* (v 1.1), Random House, Inc., http://dictionary.reference.com/browse/check (last visited November 28, 2007) (referring to 46 separate meanings).  When analyzed separately, the component parts do not immediately convey information to consumers about the nature of Vericheck's services.

10.      Similarly, evidence that the Arizona company obtained two trademark registrations (now expired) for marks incorporating the term VERICHECK plus a design component indicates that the PTO did not consider the mark to be descriptive or generic as applied to that company's services.  *See* 2 MCCARTHY § 11:69 (citing *Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112, 119-20 (1st Cir. 2006) (holding that

1   the PTO's acceptance of other marks incorporating the same term for a registration

2   supports the inherent distinctiveness of the mark at issue)); (*see, e.g.*, Ex. 7 (Arizona

3   company's registration of VERICHECK mark for "check verification services")

4   (capitalization removed).)

5        11.    Mr. Lahoti argues that the VERICHECK mark has been rendered weak

6   and, therefore, unprotectable by a crowded field of third-party use of the mark.  However,

7   most of the alleged third-party uses cited by Mr. Lahoti are in unrelated fields, and

8   "[e]vidence of other unrelated potential infringers is irrelevant to claims of trademark

9   infringement and unfair competition under federal law."  *Eclipse Assocs. Ltd. v. Data*

10  *Gen. Corp.*, 894 F.2d 1114, 1119 (9th Cir. 1990); *see also Electropix v. Liberty Livewire*

11  *Corp.*, 178 F. Supp. 2d 1125, 1130 (C.D. Cal. 2001) (rejecting relevance of trademark

12  report showing 200 companies using the mark where only two of the companies were

13  using the mark in the same or a similar industry).

14       12.    Mr. Lahoti cites three prior users of the mark in the same industry as

15  Vericheck: Credit Associates of Maui, Veri-Cheque of Canada, and Vericheck Services,

16  Inc. of Arizona.  Federal registration of the mark by a single company, along with scant

17  evidence about two other purported users, is a far cry from a multitude of registrations

18  and uses that might suggest a weak mark.  *See, e.g.*, *Petro Stopping Ctrs., L.P. v. James*

19  *River Petroleum, Inc.*, 130 F.3d 88, 94 (4th Cir. 1997) (referring to 2,700 companies, 117

20  third-party federal registrations, 63 users within the same product area, and 42 prior

21  registrations of the mark "PETRO" supported a finding that plaintiff had a weak mark);

22  *Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1511 (2d Cir.1997) (holding that

1  weakness of mark was demonstrated by over 70 trademark registrations, pending

2  applications for registration or renewal, or publications-for-opposition that included the

3  term used in plaintiff's mark); *Miss World (UK) Ltd. v. Mrs. Am. Pageants, Inc.*, 856

4  F.2d 1445, 1449 (9th Cir. 1988) (approving district court's finding of a relatively weak

5  mark where "[m]ost other pageants use a mark which is composed of a marital prefix and

6  a defining geographic term.  As a result any combination of a marital prefix and

7  geographic term 'means' beauty pageant."), abrogation recognized, *Eclipse Assocs.*, 894

8  F.2d at 1116 n.1 (referring to the standard of review); *Amstar Corp. v. Domino's Pizza,

9  Inc.*, 615 F.2d 252, 259-60 (5th Cir. 1980) (holding relevant the evidence of 72 third-

10 party uses and registrations of the appellant's mark); *cf.* 3 MCCARTHY § 17:17 (noting

11 that third-party use and a plaintiff's failure to police a mark are relevant as to whether

12 widespread use has led to the weakening of the mark).

13      13.    Mr. Lahoti presented no credible evidence that Credit Associates of Maui,

14 Veri-Cheque of Canada, and Vericheck Services, Inc. of Arizona have used the

15 VERICHECK mark in the United States to compete with Vericheck.  Mr. Lahoti never

16 attempted to admit at trial his exhibit verifying Credit Associates of Maui's use of the

17 VERICHECK mark (Ex. 16), and no reference to the VERICHECK mark is navigable

18 from that company's homepage.  *See* http://www.creditassoc.com/ (last accessed

19 November 28, 2007).

20      14.    There is no credible evidence of Veri-Cheque of Canada's use of the

21 VERICHECK mark prior to Vericheck's use in 1992, and there is no evidence of the

22 Canadian company's use of the mark in the United States.  Trademark rights are

ORDER- 20

1   territorial in nature, and possible use outside the United States does not bear on the

2   protectability of the VERICHECK mark in this country.  "Priority of trademark rights in

3   the United States depends solely upon priority of use in the United States, not on priority

4   of use anywhere in the world."  *Grupo Gigante SA De CV v. Dallo & Co., Inc.*, 391 F.3d

5   1088, 1093 (9th Cir. 2004) (quoting 4 MCCARTHY § 29:2).

6          15.     The evidence presented with respect to the Arizona company supports

7   Vericheck's position.  Mr. Lahoti failed to present any evidence whatsoever that the

8   Arizona company actually used the VERICHECK mark to compete with Vericheck's

9   services.  Mr. Lahoti testified that his own independent Internet search verified that the

10  Arizona company was not using the mark, at least on the Internet.  That the PTO allowed

11  the Arizona company to register the VERICHECK mark without requiring proof of

12  secondary meaning supports a finding that the mark is inherently distinctive.  *Lahoti*, 586

13  F.3d at 1199-1200 ("[W]e agree with the district court that the PTO's registration of the

14  Arizona Mark is evidence of the Disputed Mark's distinctiveness, given the strong

15  similarity between the appearance and purposes of the Arizona Mark and the Disputed

16  Mark."); *see Abercrombie & Fitch Co.*, 537 F.2d at 11.  "Although the statutory

17  presumption of distinctiveness applies only when the mark holder's own mark has been

18  registered, courts may also defer to the PTO's registration of highly similar marks."

19  *Lahoti*, 586 F.3d at 1199.  Additionally, "nearly identical marks used for similar products

20  may be viewed in a common light when the PTO has found one of them to be

21  suggestive."  *Id.*  The text of the mark registered by the Arizona company is identical to

22  the text of the VERICHECK mark, and the two marks are or were both used for services

ORDER- 21

1   including check verification services.  With these considerations in mind, the PTO's

2   registration of the Arizona company's mark supports a finding that the VERICHECK

3   mark is inherently distinctive as applied to Vericheck's services.  Furthermore, Mr.

4   Hannah's unrebutted testimony established that: (1) Vericheck has a continuing business

5   relationship with the Arizona company; (2) the Arizona company does not offer the same

6   services as Vericheck; and (3) the Arizona company does not use the VERICHECK

7   mark.

8       16.    Mr. Lahoti argues, nonetheless, that the Arizona company's prior

9   registration of the VERICHECK mark, without any evidence of the Arizona company's

10  use of the mark, precludes Vericheck's ability to raise counterclaims against him.  He

11  relies upon the principle that a senior registrant's prior registration of a mark on the

12  PTO's Principal Register constitutes prima facie evidence of the validity of the registered

13  mark and of the senior registrant's exclusive right to use the mark on the goods and

14  services specified in the registration.  *See* 15 U.S.C. §§ 1057(b), 1115(a); *Brookfield*

15  *Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1047 (9th Cir. 1999).

16      17.    Mr. Lahoti's argument is a *jus tertii* defense, *i.e.*, he asserts that a third

17  party, the Arizona company, has rights superior to Vericheck and, therefore, "[s]omebody

18  has a right to sue me, but it's not you."  6 MCCARTHY § 31:157 (internal marks omitted).

19  Modern courts and the Trademark Board have rejected the *jus tertii* defense.  *Id*. §

20  31:160; *see Comm. for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 820 (9th Cir.

21  1996) ("[A] third party's prior use of a trademark is not a defense in an infringement

22  action."); *Bishops Bay Founders Group, Inc. v. Bishops Bay Apartments, LLC*, 301 F.

1    Supp. 2d 901 (W.D. Wis. 2003) (holding that whether a third party might have trademark

2    rights superior to plaintiff "has no effect on this lawsuit"); *Gen. Cigar Co. v. G.D.M. Inc.*,

3    988 F. Supp. 647, 662 (S.D.N.Y. 1997) (holding that a third party's possibly superior

4    rights cannot be a defense); *Krug Vins Fins de Champagne v. Rutman Wine Co.*, 197

5    U.S.P.Q. 572, 574 (T.T.A.B. 1977) ("The fact that the third persons might possess some

6    rights in their respective marks which they could possibly assert against petitioner in a

7    proper proceeding can avail respondent nothing herein since respondent is not in privity

8    with nor is the successor in interest to any rights which such persons have acquired in

9    their marks."). This court follows suit. Mr. Lahoti acquired rights to the Domain Name

10   more than a decade after Vericheck began using the mark. "So long as plaintiff proves

11   rights superior to defendant, that is enough. Defendant is no less an infringer because it

12   is brought to account by a plaintiff whose rights may or may not be superior to the whole

13   world." 6 MCCARTHY § 31:160; *Comm. for Idaho's High Desert*, 92 F.3d at 821 (citing

14   MCCARTHY).

15          18.     In sum, the court finds the VERICHECK mark to be suggestive and,

16   therefore, inherently distinctive. The mark's strength in the marketplace is amply

17   supported by Vericheck's long use of the mark; the mark's promotion through

18   advertising, trade shows, and promotional incentives; and the expansion of Vericheck's

19   territory and client list along with an increase in sales. The VERICHECK mark is

20   therefore entitled to protection. Because Vericheck has already satisfied the other

21   elements under the ACPA, the court grants judgment in favor of Vericheck on its ACPA

22   counterclaim.

**Counterclaims II, III, and IV: Infringement Claims**

19.     To prevail on its claims of false designation of origin, common law trademark infringement, and unfair competition (collectively, "infringement claims"), Vericheck must show that it holds a protectable mark, and that Mr. Lahoti made commercial use of a mark that is similar enough to cause confusion in the minds of consumers about the origin of the goods or services in question.  *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 117 (2004).  At summary judgment, the court found that Mr. Lahoti made commercial use of the VERICHECK mark, and has determined, above, that Vericheck holds a protectable mark.  The remaining element of Vericheck's infringement claims is, therefore, whether Mr. Lahoti's use of the mark was likely to cause confusion in the minds of consumers.  *See Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1355 n.5 (9th Cir. 1985) (noting that "the question of likelihood of confusion is routinely submitted for jury determination as a question of fact").

20.     The following eight factors first announced in *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979), guide the court's analysis on likelihood of confusion:

>    (1)  the similarity of the marks;
>    (2)  the marketing channels used to promote the marks;
>    (3)  the relatedness of the goods or services promoted under the marks;
>    (4)  the strength of the plaintiff's mark;
>    (5)  evidence of actual confusion;
>    (6)  likelihood of expansion of either parties' product lines;
>    (7)  the degree of care a potential purchaser is likely to exercise; and
>    (8)  the defendant's intent in selecting the mark.

1   In the context of the Web, the three most important *Sleekcraft* factors for determining

2   likelihood of confusion are (1) similarity of the marks, (2) relatedness of the goods or

3   services, and (3) the simultaneous use of the Web as a marketing channel. *Goto.com, Inc.*

4   *v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000).

5        21.    Application of the *Sleekcraft* Internet troika shows that confusion is likely.

6   First, the court has already determined that the VERICHECK mark and <vericheck.com>

7   are identical or confusingly similar.  (*See* SJ Order at 6, 17.)

8        22.    Second, Mr. Lahoti uses the Internet in connection with competing

9   services.  Vericheck uses the mark in connection with financial transaction processing

10   services.  Mr. Lahoti uses the Domain Name in connection with a "directory"-style

11   website that includes links to companies offering services that compete with those of

12   Vericheck, such as <safepayment.com>, as well as to websites that offer "Online

13   Payments" and "Merchant Processing."  (Ex. A-10, at 110, 111, 113; *see* SJ Order at 15.)

14        23.    Third, both Mr. Lahoti and Vericheck use the Internet as a marketing

15   channel.  The crux of Vericheck's business is merchants', ISOs', and resellers' ability to

16   easily access Vericheck's website in order to facilitate the provision of Vericheck's

17   services.  Many of these customers and affiliates, in attempting to reach Vericheck's

18   website and to access Vericheck's services, would — and do — naturally type

19   <vericheck.com> and would and are immediately sent to Mr. Lahoti's competing

20   website.  (*See also* SJ Order at 15.)

21        24.    As discussed earlier, the mark is inherently distinctive and the strength of

22   the VERICHECK mark is supported by Vericheck's long and substantial use of the mark

1  since at least 1992; the company's expansion nationwide; its fulfillment of hundreds of

2  thousands of financial transactions worth millions of dollars; and substantial advertising

3  and promotion of the mark by Vericheck, its resellers, and ISOs through the Internet, in

4  print and electronic advertising, and through participation in industry trade shows.

5      25.    The remaining *Sleekcraft* factors either favor Vericheck or are neutral.  Mr.

6  Hannah presented credible, albeit uncorroborated, testimony that he received two to three

7  calls per day from Vericheck resellers about merchant confusion regarding the

8  <vericheck.com> website.  Neither party presented evidence regarding the likelihood of

9  expansion into other product lines, though Mr. Lahoti testified that he discussed licensing

10  the VERICHECK mark from the Hawaiian company GLA, Inc. for unspecified purposes.

11  This factor is nonetheless irrelevant here.  *See Victoria's Secret Stores v. Artco Equip.*

12  *Co.*, 194 F. Supp. 2d 704, 728 (S.D. Ohio 2002) (holding that likelihood of expansion of

13  product lines irrelevant where parties already directly compete).  Exercising an average

14  degree of care, a potential purchaser could conceivably visit <vericheck.com> instead of

15  <vericheck.net> and consequently become frustrated or confused by the myriad links

16  found there.  *See Electropix v. Liberty Livewire Corp.*, 178 F. Supp. 2d 1125, 1134 (C.D.

17  Cal. 2001) ("[V]irtually no amount of consumer care can prevent confusion where two

18  entities have the same name.").  Finally, the court has already found that Mr. Lahoti acted

19  with bad faith intent in selecting the mark.  (SJ Order at 12-14.)

20      26.    The court grants judgment in favor of Vericheck on the infringement

21  claims:  Lanham Act false designation of origin; common law trademark infringement

22  and trade name infringement; and common law unfair competition and misappropriation.

**Counterclaim V: Washington Consumer Protection Act**

27.     To prevail on its CPA claim, Vericheck must show: (1) an unfair or deceptive act or practice; (2) occurring in the conduct of trade or commerce; (3) affecting the public interest; (4) injuring its business or property; and (5) a causal link between the unfair or deceptive act and the injury suffered. *Nordstrom, Inc. v. Tampourlos*, 733 P.2d 208, 210 (Wash. 1987); *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 533 (Wash. 1986). The court already has determined that Mr. Lahoti's registration and use of <vericheck.com> constitute use in commerce. (SJ Order at 15-16.)

28.     Absent unusual or unforeseen circumstances, the analysis of a CPA claim will follow that of the trademark infringement and unfair competition claims: it will turn on the likelihood of consumer confusion regarding a protectable mark. *See Seattle Endeavors, Inc. v. Mastro*, 868 P.2d 120, 127 (1994) (citing *Nordstrom, Inc.*, 733 P.2d at 212 (noting that confusion of the public sufficient to meet the public interest requirement of the CPA)).

29.     The court grants judgment in favor of Vericheck on its CPA counterclaim for the reasons discussed earlier: the VERICHECK mark is strong and inherently distinctive and Mr. Lahoti intentionally infringed the VERICHECK mark by his registration and use of the <vericheck.com> domain name, which confused and diverted Vericheck's customers.

1

**Mr. Lahoti's Affirmative Defenses**

2      30.      All but one of the affirmative defenses raised by Mr. Lahoti fail in light of

3   the proof offered by Vericheck in support of its counterclaims.  (*See* Pretrial Order at 2-3

4   (Dkt. # 71).)  Mr.  Lahoti's only remaining affirmative defense, that Vericheck's claims

5   are barred by the doctrine of "unclean hands," is unsupported in fact or law.

6      31.      The equitable defense of unclean hands is a defense to a Lanham Act

7   infringement suit.  *See Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 847

8   (9th Cir. 1987).  The party seeking application of the doctrine of unclean hands "must

9   demonstrate that the plaintiff's conduct is inequitable and that the conduct relates to the

10   subject matter of its claims."  *See Levi Strauss & Co. v. Shilon*, 121 F.3d 1309, 1313 (9th

11   Cir. 1997) (quoting *Fuddruckers*, 826 F.2d at 847).

12      32.      Mr. Lahoti argues that Vericheck's counterclaims are barred by the doctrine

13   of unclean hands because Vericheck was not justified in adopting the VERICHECK mark

14   in light of the Arizona company's registration of the VERICHECK mark.  This argument

15   is essentially the *jus tertii* defense the court has already rejected.  Regardless, nothing on

16   the record supports Mr. Lahoti's position.  As Mr. Hannah testified, he is and was aware

17   of the Arizona company, and knows that it does not and has not offered services that

18   compete with those of Vericheck.  Mr. Lahoti himself stated that he conducted an Internet

19   search and concluded, "the Arizona entity was no longer using the alleged mark

20   VERICHECK."  (Ex. A-23 at 9.)  The two registrations issued to the Arizona company

21   have expired.  (*See* Exs. 7-8 (trademark registration records), 9-10 (status reports for

22

1   cancelled trademark registrations).)  The court therefore rejects Mr. Lahoti's affirmative

2   defense of unclean hands.

### Relief Sought by Vericheck

### Vericheck is entitled to an injunction, including transfer of the <vericheck.com> domain name to Vericheck

33.     "Injunctive relief is the remedy of choice for trademark and unfair

competition cases, since there is no adequate remedy at law for the injury caused by a

defendant's continuing infringement."  *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d

1175, 1180 (9th Cir. 1988); *see* 15 U.S.C. § 1116 (injunctive relief for violation of

Lanham Act § 43(a) or (d)); RCW § 19.86.090 (injunctive relief for violation of

Washington CPA).  Section 43(d) of the Lanham Act specifically authorizes district

courts to order transfer of an infringing domain name to the mark owner.  "In any civil

action involving the registration, trafficking, or use of a domain name under this

paragraph, a court may order  . . . the transfer of the domain name to the owner of the

mark." 15 U.S.C. § 1125(d)(1)(C).

34.     Vericheck is entitled to an injunction against Mr. Lahoti, prohibiting him

and his affiliates from using the term VERICHECK in any manner, including as a

domain name, and requiring him to transfer the <vericheck.com> domain name to

Vericheck.  The injunction sought is narrowly tailored to address the specific harm that is

suffered by Vericheck and to remedy actual and likely consumer confusion caused by Mr.

Lahoti's acts.

ORDER- 29

35.     The court, having found in favor of Vericheck on all claims, HEREBY
ORDERS THAT:

a.      Mr. Lahoti and each of his officers, agents, servants, employees, and
attorneys, and those persons acting in concert or participation with them who
receive actual notice of the order by personal service or otherwise shall hereby
refrain from:

i.      selling or otherwise transferring the domain name <vericheck.com>
to any third party other than Vericheck;

ii.     using in connection with its activities, products, or services the
designations VERICHECK and VERICHECK.COM, or any confusingly similar
variations thereof, or any false or deceptive designation, representation or
description of Vericheck or of its products, services or activities, whether by
symbols, words, statements, or Internet domain names, which would damage or
injure Vericheck or give Mr. Lahoti an unfair competitive advantage in the
marketplace;

iii.    engaging in acts of cybersquatting, federal, state, or common law
trade name infringement, service mark infringement, unfair competition, or
misappropriation that would damage or injure Vericheck;

iv.     inducing, encouraging, instigating, aiding, abetting, or contributing
to any of the aforesaid acts; and

1     b.     Mr. Lahoti is hereby ordered:

2     i.     to the extent Mr. Lahoti has not already done so, to take all

3 necessary steps to transfer the <vericheck.com> domain name to Vericheck within

4 10 days after entry of this order.

5 **Vericheck is entitled to an award of statutory damages**

6     36.     Vericheck requests statutory damages of $100,000 on its cybersquatting

7 claim.  15 U.S.C. § 1117(d) provides that "[i]n a case involving a violation of section

8 1125(d)(1) of this title, the plaintiff may elect, at any time before final judgment is

9 rendered by the trial court, to recover, instead of actual damages and profits, an award of

10 statutory damages in the amount of not less than $1,000 and not more than $100,000 per

11 domain name, as the court considers just."

12     37.     Vericheck is entitled to the maximum amount of statutory damages,

13 $100,000, based on the totality of facts in this case including, without limitation, Mr.

14 Lahoti's bad faith and his deliberate and knowing acts, his pattern and practice of

15 registering domain names that incorporate the trademarks of others, his efforts to extort

16 thousands of dollars in exchange for transfer of the Domain Name, his disregard for the

17 submission of inaccurate answers to interrogatories, and the actual confusion that is

18 occurring in the marketplace as a result of Mr. Lahoti's use of the Domain Name in

19 connection with a commercial website offering links to third parties that compete with

20 Vericheck.  *See, e.g.*, *Elec. Boutique Holdings Corp. v. Zuccarini*, 56 U.S.P.Q.2d 1705,

21 1710 n.11, 1713-14 (E.D. Pa. 2000) (awarding $100,000 statutory damages per domain

22 name with $27,487 attorneys' fees against "notorious cybersquatter" who "thumbs his

1   nose at the rulings of this court and the laws of our country"); *Mirage Resorts, Inc. v.*

2   *Cybercom Prods.*, 228 F. Supp. 2d 1141, 1142-43 (D. Nev. 2002) (awarding statutory

3   damages on default of $100,000, plus $13,763 attorneys' fees, and $1,000 for corrective

4   advertising); *Graduate Mgmt. Admission Council v. Raju*, 267 F. Supp. 2d 505, 512-13

5   (E.D. Va. 2003) (awarding statutory maximum of $100,000 per domain name in addition

6   to other remedies); *Pinehurst, Inc. v. Wick*, 256 F. Supp. 2d 424, 433 (M.D.N.C. 2003)

7   (awarding statutory damages of $50,000 per domain name plus attorneys' fees and costs

8   based on defendant's willful and deliberate conduct).

9       38.    Having determined that Vericheck is entitled to the maximum amount of

10  statutory damages on its cybersquatting claim, IT IS FURTHER ORDERED THAT:

11      a.    Mr. Lahoti shall pay $100,000 in statutory damages to Vericheck within 10

12            days after entry of this order.

13  **Vericheck is entitled to an award of its attorneys' fees and costs**

14      39.    An award of Vericheck's attorneys' fees and costs is authorized by the

15  Washington CPA, which provides for an award of attorneys' fees and costs to prevailing

16  plaintiffs.  RCW § 19.86.090.

17      40.    Vericheck also seeks recovery of its reasonable attorneys' fees because this

18  is an "exceptional" case under 15 U.S.C. § 1117(a).  The Lanham Act permits an award

19  of reasonable attorneys' fees to prevailing plaintiffs for violations of 15 U.S.C. § 1125(a)

20  and (d) in "exceptional cases." 15 U.S.C. § 1117(a).  "Exceptional" is defined as

21  "malicious, fraudulent, deliberate or willful."  *Gracie v. Gracie*, 217 F.3d 1060, 1068 (9th

22

1 Cir. 2000) (citation omitted); *see Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400,

2 1409 (9th Cir. 1993).

3       41.    Mr. Lahoti's acts include: willful registration and use of the Domain Name;

4 attempts to extort thousands of dollars from Vericheck in exchange for the Domain

5 Name; disregard of Vericheck's trademark rights notwithstanding his clear knowledge

6 and actual notice of them; a pattern and practice of cybersquatting, including a pattern

7 and practice of abusive litigation practices as a means to convince trademark owners to

8 drop their domain name claims or to pay for domain names; and his disregard for the

9 submission of inaccurate answers to interrogatories.  Such conduct renders this an

10 "exceptional" case.  *See, e.g.*, *Elec. Boutique*, 56 U.S.P.Q.2d 1705; *Mirage Resorts*, 228

11 F. Supp. 2d 1141; *Pinehurst*, 256 F. Supp. 2d 424; (Jost Decl., Ex. B, at 36-37, 42-43

12 (finding, in *E-Stamp Corp. v. Lahoti*, that case was exceptional and awarding attorneys'

13 fees where Mr. Lahoti engaged in pattern and practice of registering domain names with

14 a bad faith intent to profit from them)).

15       42.    Having previously reviewed Vericheck's bill of costs (Dkt. ## 89-90) and

16 Vericheck's submissions in support of its motions for attorneys' fees (Dkt. ## 91-92,

17 104-06), and having found the requested costs to be proper and the requested attorneys'

18 fees to be reasonable (Dkt. ## 99, 101, 107), IT IS FURTHER ORDERED THAT:

19       a.    Mr. Lahoti shall pay to Vericheck the combined total amount of

20            $78,109.95, which is made up of $2,553.95 in costs and $75,556 in attorneys' fees,

21            within 10 days after entry of this order.

22

ORDER- 33

1    Dated this 9th day of April, 2010.

2

3

4                                        _____
                                         JAMES L. ROBART
5                                        United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER- 34